RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0494p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

HECTOR PASCUAL,

*Petitioner,*

*v.*

No. 06-4327

MICHAEL B. MUKASEY, Attorney General of the
United States,

*Respondent.*

---

On Petition for Review of an Order
of the Board of Immigration Appeals.
No. A70 937 959.

Argued: November 30, 2007

Decided and Filed: December 19, 2007

Before: ROGERS and SUTTON, Circuit Judges; BERTELSMAN, District Judge.[*]

---

### COUNSEL

**ARGUED:** John S. Richbourg, Memphis, Tennessee, for Petitioner. Gary A. Vanasek, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Respondent. **ON BRIEF:** John S. Richbourg, Memphis, Tennessee, for Petitioner. Gary A. Vanasek, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Respondent.

---

### OPINION

---

SUTTON, Circuit Judge. Hector Francisco-Pascual claims that he is eligible for asylum and contends that the Board of Immigration Appeals (BIA) erred in ruling to the contrary. Because Pascual has not established past persecution on account of his political beliefs and because at any rate he has no reasonable fear of future persecution based on changed country conditions, we affirm.

---

[*] The Honorable William O. Bertelsman, Senior District Judge for the Eastern District of Kentucky, sitting by designation.

I.

Hector Francisco-Pascual is a native and citizen of Guatemala and a member of the Mayan Kanjobal race, one of the country's indigenous minority populations. For much of the second half of the 20th century, a civil war raged in Guatemala, pitting mostly indigenous, leftist guerrilla revolutionaries against the government and right-wing paramilitary organizations.

In responding to the guerrilla forces, the Guatemalan government created a civilian patrol to quell the insurrection. In 1989, when Pascual was 17 or 18, the government drafted him into service. In May 1990, after several months of civil-patrol duty, Pascual developed a fever and missed his patrol duties for four or five days. Because he had "not serv[ed] [his] term," patrol members sought him out, removed him from his home and repeatedly beat him with a rope. JA 43. The patrol members made him stand in a hole in the ground for two days, where "[y]ou can't even stoop down." *Id.* Although Pascual claimed he "was honestly sick," the patrol members accused him of joining the guerrilla forces, alleging that he had skipped his duties due to his allegiance to the revolutionaries. *Id.* The mayor of Pascual's municipality eventually questioned the patrol leaders about Pascual's detainment and sought his release. Although the civil patrol then released Pascual, its members continued to threaten him, telling him that he "was going to die, and that they were going to do things" to him. JA 44.

Pascual continued his service in the civil patrol for seven more months, until February 1991, when "five or six of the guerrilla grabbed" him on his way to patrol duty and said, "you will come with us, you are going to join us because you're [serving] with the government." JA 44–45. The guerrillas threatened Pascual and his family and forced him to steal chicken and corn for the guerrilla band's sustenance. For four and a half months, the guerrillas allowed Pascual to change his clothes once every fifteen days and to eat every three. One day, however, when the government engaged the guerrilla forces in battle, Pascual slipped away in the confusion and walked home.

Upon Pascual's return, his family told him that the civil patrol had threatened them, beaten his wife and demanded to know whether he had joined the guerrilla forces. Pascual's father testified that his family "was in fear of both the civil patrol and the guerrillas at that point." JA 72. Hoping to escape the turmoil, Pascual left Guatemala and traveled with his wife through Mexico and into the United States in 1991, where they have resided ever since and where they have raised four children. The Guatemalan civil war ended in 1996, and the civil patrol disbanded soon after that.

When Pascual left Guatemala, the rest of his family "picked up and moved to another part of the country, about seven or eight hours away in the mountains." JA 73. They moved to a "very quiet" mountainous region called Barrias, where there is little civilization. JA 52. While most of Pascual's family eventually joined him in the United States legally—including a naturalized sister, two other sisters, one brother and his parents—he still has a brother and a sister in Barrias. When asked whether "it would be safe . . . to go back and live in this place," Pascual responded, "I have children. I am the main support of my children [who] would suffer damages . . . if we have to go." JA 52–53. The Guatemalan government, Pascual said, has never provided anything for Mayans: "[T]hey never provided for school or anything that we wanted to do." JA 51. Pascual's father echoed the point, noting that the Guatemalan government is "uncaring" towards Mayans. JA 73.

The Immigration and Naturalization Service discovered Pascual's illegal presence and in 1997 charged him with entering the country without inspection and with thus being deportable under former INA § 241(a)(1)(B). At a hearing in 1997, Pascual conceded his deportability but renewed a previously filed application for asylum relief. Pending a final decision on the asylum application, the Immigration Judge (IJ) ordered Pascual to have his fingerprints taken by June 29, 1998, but Pascual failed to comply with the order. On January 28, 1999, the IJ determined that Pascual had

thereby abandoned his application for asylum, and Pascual appealed to the BIA. Four years later, the BIA summarily reversed the IJ's decision and remanded his case.

In 2005, at a third hearing, Pascual testified about his mistreatment at the hands of the Guatemalan civil patrol and his abduction by the guerrillas. The IJ found Pascual credible but held that he had not met his burden of proving a well-founded fear of persecution. Neither Pascual's recruitment by the guerrillas nor his punishment for missing his civil-patrol duty, the IJ determined, constituted past persecution on account of his political opinion. In reaching this conclusion, the IJ acknowledged the U.S. State Department's Country Report on Guatemala, which catalogued extant "rampant violence in Guatemala" and the economic hardship facing Mayan minorities, JA 250, but found that "this is not tantamount to [proving] a well-founded fear of persecution on account of any of the established grounds," JA 251. Even if there had been persecution, the IJ added, there were safe places in the country to which Pascual could return, undermining his claim of country-wide persecution. The BIA affirmed without opinion.

## II.

The Attorney General may grant asylum to a "refugee," 8 U.S.C. § 1158(b), defined as an alien unwilling to return home "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1101(a)(42)(A). Applicants who establish past persecution are entitled to a presumption that they cannot return home based upon a well-founded fear of future persecution, but the government can rebut this presumption if it establishes (by a preponderance of the evidence) that a "fundamental change in circumstances" in the country has undermined any such "well-founded fear." 8 C.F.R. § 1208.13(b)(1)(i)(A); *see also Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005).

Where, as here, the BIA adopts the IJ's reasoning, we review the IJ's decision directly, *Singh*, 398 F.3d at 401, and we may reverse his determination that Pascual was ineligible for asylum only if "no reasonable factfinder could fail to find the requisite fear of persecution," *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992); *see also* 8 U.S.C. § 1252(b)(4)(B). In view of the IJ's unchallenged credibility determination, we accept the substance of Pascual's testimony.

## A.

In *Elias-Zacarias*, the Supreme Court rejected a similar asylum claim. 502 U.S. at 479–80. Elias-Zacarias, like Pascual, lived in Guatemala during the civil war. And Elias-Zacarias likewise was caught between the demands of the government and the guerrillas, prompting him ultimately to resist the guerrilla's conscription efforts out of fear of governmental retribution and eventually to flee the country. *Id.* The Court rejected Elias-Zacarias's claim on the ground that a fear of retaliation from a guerrilla group's conscription efforts did not establish that the retaliation would rise to the level of "persecution *on account of* political opinion." *Id.* at 482. As the Court explained, one might reasonably refuse conscription for any number of apolitical reasons—"fear of combat, a desire to remain with one's family and friends, a desire to earn a better living in civilian life, to mention only a few." *Id.* Even if Elias-Zacarias's decision to remain neutral was "itself the affirmative expression of a political opinion," the Court said, the record did not compel the conclusion that he reasonably feared the guerrillas would "persecute him *because of* that political opinion, rather than because of his refusal to fight." *Id.* at 483. To prevail, the Supreme Court made clear, the alien must establish that the alleged persecution turned on the "*victim's* political opinion, not the persecutor's." *Id.* at 482.

Pascual's claim does not meet this standard. Pascual does not claim that he advocated, or indeed held, any particular political view when he lived in Guatemala. He instead seeks asylum based on persecution due to political opinions imputed to him by the guerrillas and the government.

The Supreme Court has not decided whether imputed political opinions may form the basis of an asylum claim. *See id.* (assuming "*arguendo*" that an erroneously imputed political opinion "would suffice"). Several circuit courts have held that they may. *See, e.g.*, *Morales v. I.N.S.*, 208 F.3d 323, 331 (1st Cir. 2000); *Delgado v. Mukasey*, No. 05-4393-ag, __ F.3d ___, 2007 WL 4180134, at *4 (2d Cir. Nov. 28, 2007); *Balasubramanrim v. I.N.S.*, 143 F.3d 157, 164 n.10 (3d Cir. 1998); *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 450 (4th Cir. 2007); *Mema v. Gonzales*, 474 F.3d 412, 416–17 (7th Cir. 2007); *De Brenner v. Ashcroft*, 388 F.3d 629, 635–36 (8th Cir. 2004); *Canas-Segovia v. I.N.S.*, 970 F.2d 599, 601–02 (9th Cir. 1992); *Najjar v. Ashcroft*, 257 F.3d 1262, 1289 (11th Cir. 2001). And we seem to have agreed with this approach in one unpublished opinion. *See Abdulnoor v. Ashcroft*, 107 F. App'x 594, 595 (6th Cir. Aug. 19, 2004). Because it is the persecutor's motive, not his or her mind-reading capacity, that the statute "makes . . . critical," *Elias-Zacarias*, 502 U.S. at 483, there is much to be said for this point of view. We need not resolve the point, however, because Pascual has not established that either of his alleged persecutors acted on account of his opinion, imputed or otherwise.

It takes little imagination to envision the plight of a Mayan caught between the forces of the Guatemalan government and the guerrillas during the civil war. And in this case no imagination is needed, because we have a record replete with credible testimony from Pascual about the ruthless treatment he received at the hands of each side to the dispute. Still, the record supports the IJ's determination that the actions of the government and the guerrillas furthered the groups' political aims, not that they were designed to persecute Pascual on account of his political beliefs. Start with the civil patrol. No one contends that the government conscripted just one ethnic group and forced its members, and its members alone, to bear the brunt of military service. That forces Pascual to complain about a general requirement of conscription. Yet it is hardly unusual, much less a form of persecution, for governments to conscript their citizens into military service, then to punish those who do not fulfill their duty. Such conduct does not by itself ordinarily rise to the level of persecution on the basis of political opinion. *See Bradvica v. I.N.S.*, 128 F.3d 1009, 1013 (7th Cir. 1997); *Gojcevic v. Gonzales*, 142 F. App'x 257, 261 (6th Cir. July 28, 2005) ("Refusal to perform military service in one's native country is not ordinarily a valid basis for establishing asylum eligibility.") (internal quotation marks and alterations omitted); *cf. Elias-Zacarias*, 502 U.S. at 482 (holding that "forced recruitment" is not necessarily political persecution). Pascual's own testimony confirms that the civil patrol beat him because he "was not serving [his] term" of mandatory duty. JA 43. True, the patrolmen accused him of "being part of the guerrilla," *id.*, and threatened his family on that account while he was in captivity. These statements, however, do not compel a factfinder to conclude that he was being persecuted on account of his political opinion. It is just as plausible that they show only why the civil patrol might have been skeptical of Pascual's explanation for missing several days of service—that he was sick—and thus continued to punish him because he was a deserter. Confirming the plausibility of this explanation, Pascual served seven more months in the civil patrol after his beating without any apparent incident, allowing the conclusion that the civil patrol's actions stemmed from an unfortunate and inhumane form of military discipline, not political persecution.

A similar conclusion applies to the guerrillas' abduction of Pascual. That action, too, could fairly be characterized as motivated by the guerrillas' own military, political and welfare needs, not a desire to make Pascual pay for his political opinions. According to Pascual's own testimony, the guerrillas used him to support their revolutionary cause by making him steal food for them. "[T]he mere existence of a generalized 'political' motive underlying the guerrillas' forced recruitment is inadequate to establish (and, indeed, goes far to refute) the proposition" that their actions were taken because of anything Pascual believed. *Elias-Zacarias*, 502 U.S. at 482. Even if the guerrillas abducted Pascual for what he was "doing with the government," JA 45, that does not establish political persecution. The obligatory nature of service in the civil patrol precludes the guerrilla forces (or for that matter anyone else) from crediting Pascual with any political opinion based solely on his service in the patrol. And the guerrilla force's abduction of members of the civil patrol is as

apt to be motivated by a desire to incapacitate its adversaries as by a desire to retaliate against a political opponent—making it impossible to say that the record compelled the IJ to find political persecution.

One final thought on this point: even if persecution on account of an imputed political opinion could warrant an asylum grant in some circumstances, imputed-opinion applicants may have more difficulty proving that they cannot return because of that persecution. *See* 8 U.S.C. § 1101(a)(42)(A) (requiring the alien to be "unable or unwilling to return . . . *because of* persecution or a well-founded fear") (emphasis added). Imputed-opinion persecution, it is well to remember, is premised on a persecutor's "mistaken belief about the victim's views," *Canas-Segovia v. I.N.S.*, 970 F.2d 599, 602 (9th Cir. 1992), meaning that finding a well-founded fear of future persecution would require an inquiry into whether the prospective persecutor would make the same mistake again if the alien returned. That seems quite unlikely in this case. Why would anyone today ascribe a mistaken anti-government or anti-guerrilla opinion to Pascual—given that the war ended over ten years ago and the government has since disbanded the civil patrol? Pascual offers no explanation why or how that could happen. Even if Pascual had been subjected to past political persecution based on an imputed political view, in other words, we nonetheless would be compelled to affirm.

B.

Pascual's claim also fails on an independent ground: changed conditions in Guatemala. Although the U.S. State Department's Country Report on Guatemala notes ongoing violence and other problems, it says that "[t]here were no substantiated reports of politically motivated killings" and the current Guatemalan government "generally respect[s] the human rights of its citizens." JA 193.

That presents a problem for Pascual's claim. In his asylum application, he complained about two sources of abuse—the civil war, which ended in 1996, and the civil patrol, which the government has disbanded. In this sense, Pascual's claim is significantly easier than that addressed by the Court in *Elias-Zacarias*, as that case was decided while the Guatemalan civil war was still ongoing. 502 U.S. at 483. Moreover, Pascual has not established a "pattern or practice" of persecution against Mayans or any other group to which he belongs. *See* 8 C.F.R § 1208.13(b)(2)(iii)(A). Accordingly, as the war subsided, so did any objectively reasonable fear of persecution.

Resisting this conclusion, Pascual testified that the Guatemalan government has never "provided for school or anything" for Mayans, JA 51, testimony that his father bolstered in noting that the Guatemalan government is "uncaring" toward indigenous peoples, JA 73. The State Department's report on Guatemala provides some support for these conclusions, noting that indigenous peoples are "outside the country's political, economic, social, and cultural mainstream," JA 209, and have "limited educational opportunities and fewer employment opportunities," JA 210. Yet economic stratification and deficient government support, regrettable though they are, do not establish a cognizable case of persecution. *See Daneshvar v. Ashcroft*, 355 F.3d 615, 624 (6th Cir. 2004) (rejecting an asylum claim based on general claims of human rights violations and economic disadvantages).

Making matters more difficult, Pascual has failed to show that, even if he had a reasonable fear of persecution in certain portions of the country, he could not "avoid persecution by relocating to another part of [his] country," something that "it would be reasonable to expect [him] to do." 8 C.F.R § 1208.13(b)(2)(ii); *see also In re Acosta*, 19 I. & N. Dec. 211, 235 (BIA 1985), *modified on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). The record indicates that Pascual could reasonably and safely return to live in Barrias, the "very quiet" mountainous region where members of his family have lived since 1991. JA 52. Although Pascual states that "[t]here

is nothing there," JA 52, the fact that members of his family reside in Barrias makes it reasonable to expect him to be able to do so as well. When Pascual was asked whether he could safely return to Barrias, he evaded the question by responding that he is the "main support of [his] children [who] would suffer damages." JA 52–53. His answer implies that it would be safe to return there and, more significantly, makes it clear that Pascual's fear of returning to Guatemala is not borne of a risk of political persecution but of economic and familial harm. While we have considerable sympathy for Pascual's plight, it does not suffice to establish eligibility for asylum.

* * * * *

At oral argument, the helpful counsel for each party acknowledged that Pascual's parents and employer have independently filed visa petitions on Pascual's behalf, both of which the government has approved subject to the relevant waiting lists. At some point in the relatively near term, in other words, Pascual and his wife are quite likely to obtain permission to reside in the United States legally. Pascual has now lived here for over 16 years, raised four children in this country and by all accounts conducted himself as a productive member of society. As federal judges, it is of course not our province to do anything but deny the petition for review when that is what the law and our standard of review require. At the same time, however, we see no harm in pointing out the obvious—that, if Pascual and his wife are apt to receive permission to stay in this country soon, it may not make sense for the government to deport them immediately, whether the law permits it to do so or not, in view of the harm deportation will cause their children and family.

III.

For these reasons, we deny the petition for review.