NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0490n.06

**Case No. 18-3106**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

```
                                      FILED
                                    Oct 02, 2018
                               DEBORAH S. HUNT, Clerk
```

| | |
|---|---|
| MARIA DE LA LUZ GALLEGOS-ALVAREZ; JOVANI JIMENEZ-GALLEGOS; MARIO EZEQUIEL GALLEGOS ALVAREZ, )  )  ) | |
| Petitioners, ) | ON PETITION FOR REVIEW FROM THE UNITED STATES BOARD OF IMMIGRATION APPEALS |
| v. ) | |
| JEFFERSON B. SESSIONS, III, Attorney General, )  )  ) | |
| Respondent. ) | O P I N I O N |

BEFORE: COLE, Chief Judge; WHITE and NALBANDIAN, Circuit Judges.

COLE, Chief Judge. Maria De La Luz Gallegos-Alvarez, a forty-year-old native and citizen of Mexico, entered the United States without inspection in February 2014, along with her adult son Mario and minor son Jovani. The Gallegos family[1] now petitions for review of a decision by the Board of Immigration Appeals ("BIA") affirming an immigration judge's denial of their applications for asylum, request for withholding of removal, and protection under the Convention Against Torture ("CAT"). The BIA found that Maria Gallegos-Alvarez ("Gallegos") had not

---

[1] Maria Gallegos-Alvarez's minor son, Jovani, is a derivative beneficiary of his mother's asylum application. *See Akhtar v. Gonzales*, 406 F.3d 399, 406 (6th Cir. 2005) ("Under 8 U.S.C. § 1158(b)(3)(A), a 'child' accompanying, or following to join, a parent who is granted asylum may be granted derivative asylum by virtue of his or her parent's status as a refugee."). Mario, on the other hand, filed a separate asylum application "based on incidents that happened to his mother" and "fear[ed] persecution on account of his relationship to his mother." Mario and his mother's cases were consolidated, so for ease of reference, the court will refer only to Maria Gallegos-Alvarez's petition.

shown that she had a well-founded fear of persecution based on the fact that she was an honest former law enforcement agent who would not return to work. Because the BIA's decision was supported by substantial evidence, we deny Gallegos's petition for review.

## I. BACKGROUND

### A. Factual Background

Gallegos was born in Mexico in 1977. Between 2005 and 2012, Gallegos and her two sons lived in the United States without lawful status, but returned to their hometown in Jalisco, Mexico in 2012. After returning to Jalisco, Gallegos joined the local police force in January 2013. According to Gallegos, she observed wide-spread corruption during her time as a police officer. On one occasion, Gallegos was involved in the arrest of an individual who "was in possession of a firearm of high caliber." Gallegos learned that the individual was a man who worked for "Fidel," the leader of a narco-trafficking gang known as La Plaza. Shortly after the man's arrest, Fidel spoke with the head of the police force, Edward Navarro, who released the man to Fidel in exchange for 3500 pesos.

On another occasion, while on-duty and providing security at a dance ranch, Gallegos's partner, Officer Refugio, introduced her to Fidel. Gallegos testified that during the course of this conversation, Fidel and Officer Refugio plotted to have another officer, David Prieto, assassinated for his refusal to work with the gang. During the conversation, Gallegos was not threatened at any time. Gallegos resigned from the police force effective October 2013, "due to stress."

In January 2014, Officer Florentino contacted Gallegos about returning to the police force. Gallegos believed Officer Florentino worked for Fidel because people "always said so." In her declaration, Gallegos stated that "she knew the real reason why they wanted me to come back was because they wanted me as a [sic] informant; inform them about everything that was happening in

the cabin, reports of soldiers, and calls." Officer Florentino allegedly reminded Gallegos that she "knew how the people from 'la plaza' were, that they were good when people cooperated, and that it was better for me to return to the police and that my family was going to be fine." During her removal proceedings, however, Gallegos testified that the police department requested her return because they were "unable to hire another female coworker." Plus, Gallegos already "knew everything they had to do there" and she left "with a good image." Gallegos agreed to return to work, but several days later, fled to the United States.

During her removal proceedings, Gallegos testified that she left Mexico because she feared La Plaza would locate her and harm either her or her children. When asked why she could not have stayed in Mexico, she responded, "[b]ecause I had agreed that I was going to come back and work with them, and then it will be like I'm laughing at them." Since entering the United States, however, Gallegos and her family have received no threats, nor have family members still living in Mexico been threatened or harmed in any way. To Gallegos's knowledge, none of her former colleagues on the police force have been harmed or threatened, including Officer Prieto.

During Gallegos's proceedings, Dr. Robert Kirkland, director of graduate education at Colorado State University, testified as an expert. Dr. Kirkland testified that La Plaza was a local affiliate of the Jalisco New Generation cartel, which he described as "the most powerful cartel in Jalisco." Based on a one-hour interview with Gallegos and a review of her declaration, Dr. Kirkland opined that Gallegos would be in danger upon return to Mexico due to her defiance of the cartel. But Dr. Kirkland also testified that because Gallegos was not harmed by La Plaza in the twelve months after she joined the police force, "she may perhaps be less of a person of interest because they didn't harm her immediately."

## B. Immigration Court Decision

On April 11, 2017, an immigration judge ("IJ") denied Gallegos's application for asylum, withholding of removal, and protection under the CAT. (IJ Dec., A.R. 85–110.) The IJ found that Gallegos "lack[ed] credibility and her testimony alone was unpersuasive as it lacked specificity or detail in the key elements of her claim." (*Id.* at 104.) The IJ did find Dr. Kirkland to be credible, but noted that he "provided little in the way of information about the cartel's history of targeting officers or any policy aimed at taking out honest police officers or those that did not cooperate during their employment or after they had quit the force." (*Id.*) Ultimately, the IJ found that Gallegos failed to demonstrate past persecution, failed to establish that she would be harmed because of her status as an honest police officer, and failed to establish that she could not safely relocate. (*Id.* at 105–08.)

## C. BIA Decision

The BIA, in affirming the IJ's decision, assumed that Gallegos presented credible testimony. (BIA Dec., A.R. 4.) The BIA held, however, that Gallegos had not shown she had a well-founded fear of future persecution[2] on account of a statutorily protected basis. (*Id.*) Specifically, the BIA found that she had not presented sufficient evidence to show that anyone would attempt to harm her because she was an honest police officer who would not return to work. (*Id.*) In support, the BIA noted that Gallegos was asked to return to work for a legitimate reason— the police force needed more female officers. (*Id.* at 4–5.) Moreover, she never provided, nor was she ever asked to provide, information to La Plaza; she, nor anyone on the police force, had ever been threatened or harmed by anyone in La Plaza; and she had not received any threats during her time in the United States. (*Id.*) Thus, the BIA concluded that Gallegos had not demonstrated a

---

[2] Gallegos did not challenge the IJ's conclusion that she had not sufficiently demonstrated past persecution in Mexico. (BIA Dec., A.R. 4 n. 3.)

well-founded fear of persecution based on her membership in the social group of "honest former police officers." (*Id.* at 5.)

The BIA also held that Gallegos failed to show that she would be unable to relocate safely within Mexico. (*Id.*) Her family members in Mexico had not been harmed or threatened; she did not claim that La Plaza had sought her out prior to leaving Mexico; and there was no evidence that La Plaza was looking for her since her entry into the United States. (*Id.*) And although Dr. Kirkland testified that cartel members search for police officers that do not assist them, the BIA noted that he "did not present evidence regarding whether La Plaza is specifically interested in [Gallegos] and would search for her throughout Mexico." (*Id.*) Accordingly, the BIA found that relocation would not be unreasonable and upheld the IJ's denial of Gallegos's asylum application. (*Id.*)

Because Gallegos did not satisfy the lower statutory burden of proof required for asylum, the BIA held that she also did not satisfy the clear probability standard of eligibility required for withholding of removal. (*Id.*) Additionally, with respect to the CAT claim, the BIA found that Gallegos failed to demonstrate that it is more likely than not that she would be tortured in Mexico by or with the acquiescence of a public official or other person acting in an official capacity. (*Id.* (citing 8 C.F.R. §§ 1208.16(c) and 1208.18(a).))

## II. ANALYSIS

### A. Standard of Review

"Because the BIA did not summarily affirm or adopt the IJ's reasoning and provided an explanation for its decision, we review the BIA's decision as the final agency determination." *Young Hee Kwak v. Holder*, 607 F.3d 1140, 1143 (6th Cir. 2010) (quoting *Ilic-Lee v. Mukasey*, 507 F.3d 1044, 1047 (6th Cir. 2007)). We review the BIA's factual findings under a substantial

evidence standard, upholding such findings so long as they are supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Zhao v. Holder*, 569 F.3d 238, 247 (6th Cir. 2009) (citations omitted). "Under this deferential standard, the court may not reverse the Board's determination simply because we would have decided the matter differently." *Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008) (citation omitted). Administrative findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

### B. Asylum Claim

"An applicant for asylum bears the burden of establishing that [she] is a 'refugee' as defined by the INA." *Kukalo v. Holder*, 744 F.3d 395, 400 (6th Cir. 2011) (citing 8 U.S.C. § 1158(b)(1)(B); *Koliada v. I.N.S.*, 259 F.3d 482, 486–87 (6th Cir. 2001)). An applicant may establish her status as a refugee by showing that she is "unable or unwilling to return to her country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Allabani v. Gonzales*, 402 F.3d 668, 674 (6th Cir. 2005) (quoting 8 U.S.C. § 1101(a)(42)(A)). "To prove one's refugee status, one must present specific facts demonstrating suffering of past persecution or a well-founded fear of future persecution motivated by one of these five statutorily protected grounds." *Id.* (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). In establishing a well-founded fear of persecution, "an applicant cannot rely on speculative conclusions or mere assertions of fear of possible persecution[.]" *Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007) (internal quotation marks and citation omitted); *see also Kaba v. Mukasey*, 546 F.3d 741, 748 (6th Cir. 2008) ("'[P]ersecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical

punishment, infliction of harm, or significant deprivation of liberty."). An alien's fear of persecution must be both subjectively genuine and objectively reasonable. *Id.*

The ambiguous threat from Officer Florentino, with nothing more, does not support Gallegos's fear of future persecution. We assume, as the BIA did, that Gallegos presented credible testimony regarding her conversation with Officer Florentino. And we assume that her conversation with Officer Florentino created genuine fear. But aside from that interaction, Gallegos never had another encounter, let alone a threatening one, with a member of La Plaza or a coworker assisting the gang. (Hr'g Tr., A.R. 156.) Indeed, Gallegos experienced no physical harm during her time as a police officer or during the time following her resignation from the police force. (*Id.* at 165.) Neither Gallegos, nor her family still living in Mexico, have ever received any threats from La Plaza. (*Id.* at 162, 170, 180.) And she cannot point to a single police officer that has been harmed by La Plaza. (*Id.* at 163, 166.) Thus, Gallegos fails to show how her membership as an honest police officer would make her susceptible to conduct that arises to the level of persecution. *See Allabani*, 402 F.3d at 674.

Finally, Gallegos's alleged fear of future persecution "is undermined because she has not demonstrated that the cause of her fear is countrywide." *Moran-Quinteros v. Holder*, 352 F. App'x 974, 979 (6th Cir. 2009) (citing 8 C.F.R. § 1208.13(b)(2)(ii) ("An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country....")). Again, the record indicates that Gallegos's extended family continues to live safely in Mexico. (Hr'g Tr., A.R. 162, 180, 185.) Although Gallegos testified that she was afraid to relocate because of La Plaza's connections, she offered no evidence that La Plaza is currently looking, or will look, for her if she returns. (*See id.* at 164.) Similarly, Gallegos's

son Mario was unable to provide an answer at the removal proceedings as to why he believed La Plaza would look for them in a different area of Mexico. (*See id.* at 182.)

Because there is no evidence in the record that any of Gallegos's family members have received threats from La Plaza, or any evidence that La Plaza is looking for her at this time, it is reasonable to expect that Gallegos can safely relocate. *See Pascual v. Mukasey*, 514 F.3d 483, 489 (6th Cir. 2007). We therefore affirm the decision of the BIA to reject Gallegos's application for asylum because the record does not compel a finding of a well-founded fear of future persecution upon return to Mexico.

### C. Withholding of Removal

Gallegos also seeks review of the BIA's denial of withholding of removal. "To obtain such relief, a petitioner must show by a 'clear probability' that her life or freedom would be threatened on account of her race, religion, nationality, membership in a particular social group, or political opinion." *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004) (citation omitted). Because Gallegos fails to meet the lesser standard for asylum, she necessarily fails to meet the "more stringent requirements" for withholding of removal. *See id.*; *Kaba*, 546 F.3d at 751 ("[I]t follows from [petitioner's] failure to establish eligibility for asylum that he also cannot satisfy the more onerous burden for withholding of removal."). Consequently, we deny Gallegos's petition for review regarding her withholding of removal application.

### D. Relief under the CAT

Gallegos similarly fails to meet her heavy burden of proof under the CAT. To obtain relief under the CAT, a petitioner "must prove 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Kukalo*, 744 F.3d at 402 (quoting *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004)). "Torture is defined as 'any act by which severe

pain or suffering, whether physical or mental, is intentionally inflicted on a person ... when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1139 (6th Cir. 2010) (quoting 8 C.F.R. § 1208.18(a)(1)). But unlike asylum and withholding claims, "[n]o protected-ground nexus is required" to qualify for protection under the CAT. *Haider v. Holder*, 595 F.3d 276, 289 (6th Cir. 2010). Accordingly, a petitioner's inability to establish an asylum claim does not necessarily preclude relief under the CAT, but "it is not easy to overcome such a barrier." *Kukalo*, 744 F.3d at 402.

The record evidence does not compel a conclusion contrary to the BIA's holding that Gallegos failed to demonstrate "that it is more likely than not that she would be tortured in Mexico by or with the acquiescence of a public official or other person acting in an official capacity." (BIA Dec., A.R. 5.) As previously mentioned, Gallegos and her family have never been physically harmed, let alone tortured, and have received no threats from La Plaza indicating that they may be harmed upon their return. (*See* Hr'g Tr., A.R. 162, 165, 170, 180.) Thus, the record supports the BIA's conclusion that the petitioners failed to meet the requirements to qualify for protection under the CAT.

### III. Conclusion

For the foregoing reasons, we affirm the BIA's decision and deny Gallegos's petition for review.