**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name:  08a0234n.06
Filed:  May 5, 2008

**No. 07-3703**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| GJEK VUKTILAJ and LILIJETA VUKTILAJ, | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) ) | ON PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION APPEALS |
| MICHAEL B. MUKASEY, | ) ) | |
| Respondent. | ) | |

Before:  BATCHELDER, SUTTON, and FRIEDMAN, Circuit Judges.[*]

SUTTON, Circuit Judge.  Gjek Vuktilaj and his wife, Lilijeta, seek review of an order

denying their applications for asylum and withholding of removal and for relief from the Convention

Against Torture.  Because a reasonable adjudicator could find that Vuktilaj was not credible and that

he did not otherwise satisfy his burden of proof and because, as a separate matter, his administrative

hearing did not violate due process, we deny the petition for review.

I.

Gjek Vuktilaj grew up in the Albanian village of Vermosh, where he advocated the end of

communism and supported the Democratic party.  Vuktilaj claims he was arrested twice and beaten

_____

[*] The Honorable Daniel M. Friedman, Senior Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

for his political activity—for nine days beginning on January 14, 1990 (after he helped Democratic Party members topple a statue of Stalin), and for seven days beginning on April 2, 1991 (after he protested election irregularities). Each time, Vuktilaj says, the officers threatened his life, beat him and gave him no food or water.

Soon after the Democratic Party won the 1992 elections, bringing an end to the communist regime, Vuktilaj's party affiliation earned him a job as a policeman. Even then, however, Vuktilaj's family's troubles were not behind him. On June 1, 1995, communist sympathizers allegedly murdered Vuktilaj's father by hitting him over the head with a metal pipe. And in 1997, when the Socialist Party unseated the Democratic government, Vuktilaj lost his job as a policeman.

On October 2, 2000, Vuktilaj worked as an elections commissioner for the Democratic party and objected to various election irregularities he witnessed. On Vuktilaj's walk home from the polls, he claims, unidentified "people with masks on" brutally attacked him with rubber sticks of the type that "[o]nly police troops can use," injuring his ribs and breaking his nose. JA 212–14. The men threatened to kill him, and Vuktilaj escaped only when a car's headlights scared the men away. Over the next two days, Vuktilaj received threatening phone calls, after which he and his wife, Lilijeta, left their home on October 4. The couple made their way to the United States, and each of them entered the country with a fake passport.

Vuktilaj sought asylum for the two of them in November 2001, and the government initiated removal proceedings against them in January 2002. Vuktilaj and Lilijeta conceded their

removeabllility but renewed their applications for asylum and withholding of removal and asked for relief under the Convention Against Torture. After listening to testimony from Dr. Bernd Fischer (an expert on Albania), Vuktilaj, Lilijeta and Vuktilaj's cousin, the IJ determined that Vuktilaj was not credible based on inconsistencies in his testimony and the "somewhat general" nature of his claim. JA 31. Although the BIA "agree[d] with" Vuktilaj that one of the discrepancies noted by the IJ "may have actually resulted from confusing testimony," it adopted the IJ's adverse-credibility determination, finding that Vuktilaj's "testimony was vague [and] far short of revealing the details" necessary to support his claim. The BIA also held that, consistent with the IJ's decision, Vuktilaj should have produced corroborating evidence to support his claim, and it separately affirmed the IJ's denial of relief under the Convention Against Torture.

II.

A.

The Attorney General may grant asylum to "refugee[s]," 8 U.S.C. § 1158(b), defined as aliens "unable or unwilling to return" home "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1101(a)(42)(A). When the BIA adopts the IJ's opinion, we review the IJ's decision as the final agency action, *see Pascual v. Mukasey*, 514 F.3d 483, 486 (6th Cir. 2007), and we will accept the agency's findings "unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B). We review credibility determinations, like other asylum-

eligibility findings, under the "substantial evidence" standard. *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004). Although "minor and irrelevant inconsistencies" cannot support an adverse credibility ruling, *Sylla v. I.N.S.*, 388 F.3d 924, 926 (6th Cir. 2004), we will uphold such a ruling if the testimony "plausibly could be viewed as incredible" and if, without the testimony, the applicant cannot meet his burden of proof, *Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004).

Substantial evidence supports the IJ's adverse credibility finding in this case. Vuktilaj's testimony, for one reason, was inconsistent in some places and false in others. When asked how he obtained documents attached to his application, Vuktilaj testified that he brought the couple's birth certificates, their marriage certificate and a letter from the Democratic party with him when he came to the United States in 2000. But each of the certificates bears a 2001 date, and the letter from the Democratic party is dated January 8, 2003. When his attorney pressed him on the letter from the Democratic party, he acknowledged that he must not have "look[ed] at [it] very well" when he first testified, "but this one [he] received . . . after" he came to the United States. JA 224–25. On cross examination, the government asked Vuktilaj when he received his birth certificate, and Vuktilaj equivocated, saying first he was "not sure" but then claiming he "brought it with [him]." JA 244–45. When the judge questioned him about the date on the birth certificate, Vuktilaj recanted, saying that he did not remember when he obtained each of the documents because he "do[es]n't have much education" and he has a weak "memory." JA 259.

Vuktilaj's "demeanor changed" after the government confronted him with the date discrepancy, JA 39, the IJ observed, and our standard of review recognizes that "the IJ is in the best

position to determine credibility based on the demeanor of the witness," *Gjolaj v. Keisler*, 252 F.

App'x 64, 68 (6th Cir. Oct. 23, 2007). We have upheld credibility findings where petitioners have

"change[d] and embellish[ed] [their] version of events," *Bzhetaj v. Gonzales*, 142 F. App'x 913, 916

(6th Cir. Aug. 10, 2005) (per curiam); *see also Jelkovski v. INS*, 103 F. App'x 578, 580 (6th Cir.

June 18, 2004) (upholding adverse credibility determination where petitioner "changed his story on

cross-examination"), and a reasonable adjudicator could find that is just what Vuktilaj did here.

In other instances, Vuktilaj appeared to embellish his story in response to difficult questions.

He testified that no one from the Socialist government had come to his home looking for him. But

when the judge questioned how he could fear returning to Albania if no one was looking for him,

Vuktilaj said that his enemies came to his home in secret, "pretend[ing] to be [his] friend[s]" and

asking his mother where he was. JA 261. At another point in the hearing, when the IJ asked

Vuktilaj why he feared returning when none of his other family members who still remained in

Albania had experienced problems, Vuktilaj claimed for the first time that his family members do

in fact "have problems" and indeed "are scared to death" and "don't dare to go out." JA 239. The

IJ could plausibly believe these statements were "attempt[s] to embellish or enhance his claim," JA

35, and to "simply make up an explanation" for any deficiencies "as he [went] along," JA 40.

The "vague and ambiguous" nature of portions of Vuktilaj's testimony also supports the IJ's

adverse credibility finding. *Neziraj v. Gonzales*, 207 F. App'x 550, 556 (6th Cir. Nov. 27, 2006).

Despite Vuktilaj's capacity to chronicle many harmful incidents relating to him and his family, he

"was not even able to articulate carefully" whom he feared, JA 33, using the terms "socialists" and

"communists" interchangeably and simply saying that "they are going to kill me," JA 234, 217. When asked whom "they" referred to, he could say only "[t]hose people that killed my father, the secret police." JA 217. Credibility determinations "encompass[] not just consistency but also plausibility and sufficient detail," *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004), and the record here shows that Vuktilaj's testimony lacked the kinds of specifics that could fairly be expected of him and that would have lent his story substance and believability.

We need not quibble over Vuktilaj's point that other testimonial inconsistencies and gaps in his testimony were minor or stemmed from confusion. The fact remains that the "cumulative effect" of (1) the identified discrepancies, *Yu*, 364 F.3d at 704, (2) Vuktilaj's vague testimony about whom he fears, a point that goes to the "heart of [his] asylum claim," *id.* at 703–04 (internal quotation marks omitted), and (3) the IJ's observation of Vuktilaj's demeanor provides sufficient evidence to support the IJ's adverse credibility finding.

That leads to a separate problem with this claim. While an adverse credibility finding alone will not defeat a claim for asylum, it will undermine a claimant's efforts to meet his burden of proof—particularly when the claimant reasonably could have presented, but did not present, corroborating evidence to support the claim. *Dorosh*, 398 F.3d at 382. Vuktilaj claims he broke his nose during the October 2000 attack, for example, but he provided no evidence to support his assertion. Certain injuries, it is no doubt true, cannot be corroborated. *See Begu v. Gonzales*, 162 F. App'x 425, 429 n.2 (6th Cir. Jan. 3, 2006) ("Not all beatings leave physical marks, and the inability of lay persons to identify such evidence alone is not sufficient to determine that the alleged

acts never occurred."). But a broken nose that "still moves around," as Vuktilaj testified, JA 214, is not such an injury; it is the kind of allegation that an applicant could readily corroborate through the simple expedient of obtaining an x-ray or a doctor's examination. Vuktilaj, indeed, testified that his wife had seen doctors since the two of them entered the United States. The IJ did not exceed his discretion in finding that Vuktilaj reasonably could have provided medical corroboration for his claim.

Nor did the IJ err in questioning Vuktilaj's failure to provide documents from Albania to support his other factual assertions, such as an affidavit from his mother or a letter from an Albanian hospital regarding the cause of his father's death. Vuktilaj has received documents from Albania in the mail, his cousin has visited Albania twice since Vuktilaj came to the United States, and his birth and other identifying certificates and letters are dated after his entry to the country, all showing he had ample opportunities to obtain such evidence. *See Dorosh*, 398 F.3d at 383 (upholding a requirement of corroboration where "[p]etitioner was in contact with her mother . . . yet . . . she produced no affidavit from her").

Vuktilaj, we acknowledge, submitted some documents and the testimony of three other individuals to corroborate his testimony. But neither the testimony nor the documents meaningfully advance his claim. None of the witnesses testified on the basis of first-hand observations: Dr. Fischer premised his testimony "upon [Vuktilaj's] statement," JA 154; Lilijeta admitted she did not know "what actually happened" to Vuktilaj because she "was very sick" and did not learn about Vuktilaj's troubles until long after the events in question, JA 267; and Vuktilaj's cousin did not

observe either of the arrests he purported to corroborate. The documents failed to include information that might have buttressed Vuktilaj's testimony and that one could expect such evidence to include: One document showed when Vuktilaj worked as a police officer but not how or why he was fired; and neither his father's death certificate, nor the photo of his father's grave, provides any evidence that his father was murdered. The authenticity of some of the documents also remains in doubt: Several of them, including one from the Democratic Party regarding his father's death, lack "diacritical" marks typical of the written Albanian language, something even Vuktilaj's expert acknowledged generally "would be used in all" such documents. JA 176.

In the final analysis, because the record does not compel a finding that Vuktilaj is credible and because he did not otherwise corroborate his claim, he has not met his burden to prove eligibility for asylum and necessarily cannot satisfy the "more stringent standards" for establishing a claim for withholding of removal. *Yu*, 364 F.3d at 703 n.3. And for related reasons, he also cannot establish a cognizable claim under the Convention Against Torture: No credible evidence in the record compels a finding that Vuktilaj "more likely than not . . . would be subjected to torture" on his return to Albania. *Kouljinski v. Keisler*, 505 F.3d 534, 545 (6th Cir. 2007).

B.

Vuktilaj raises two procedural arguments for reversal, each unpersuasive. *First*, he argues that the IJ violated his due process right to a "full and fair" hearing by failing to consider all of the record evidence. *Mapouya v. Gonzales*, 487 F.3d 396, 415–16 (6th Cir. 2007). Yet the record shows

that the IJ considered all of the hearing testimony, explained why she found Vuktilaj not credible and explained why she did not find any of the other testimony or evidence helpful. Vuktilaj premises his argument to the contrary on his disagreement with the IJ's weighing of the evidence, not on any proof that the IJ failed to consider the evidence.

Although Vuktilaj complains that the IJ did not address the potential for religious persecution if he returned to Albania, that was his fault, not the IJ's. Vuktilaj never mentioned this risk in his testimony or application. In his testimony, he simply mentioned that he was Catholic, and in his asylum application, he asserted persecution only on the basis of "Political opinion," leaving the "Religion" box blank. JA 373. Dr. Fischer, we recognize, testified that religious intolerance is on the rise in Albania, but that did not obligate the IJ to address a claim Vuktilaj never raised.

To the extent Vuktilaj means to raise a due process objection based on the BIA's failure to address all of the record evidence in its opinion, that too is mistaken. By adopting the opinion of the IJ and by citing *In re Burbano*, 20 I. & N. Dec. 872 (BIA 1994), the Board demonstrated that it "independently reviewed the case" and its decision was simply "in agreement with the reasoning and result" of the IJ's opinion. *Gishta v. Gonzales*, 404 F.3d 972, 980 (6th Cir. 2005) (internal quotation marks omitted).

*Second*, Vuktilaj claims that the IJ mistakenly merged his asylum and Convention Against Torture claims. Although an adverse credibility finding on an asylum claim may "erroneously infect[]" a Convention Against Torture analysis, *Mapouya*, 487 F.3d at 415, that did not happen here.

The IJ made a separate, though brief, finding that the evidence "in no way establishes that it is more likely than not that [Vuktilaj] would be tortured if returned to Albania," JA 48, and the BIA adopted this finding.  In some cases, we recognize, applicants may "succeed on a CAT claim even though a withholding of removal claim is denied" because the Convention standard operates "without regard to the enumerated grounds for asylum." *Karomi v. Gonzales*, 168 F. App'x 719, 729 (6th Cir. Feb. 24, 2006).  But where a denial of asylum is based on the applicant's failure to prove a reasonable fear of persecution (rather than on the absence of the requisite motivation behind the mistreatment), we have held that those applicants necessarily "cannot meet the more stringent requirements of the Convention Against Torture." *Sarr v. Gonzales*, 485 F.3d 354, 362 (6th Cir. 2007).  Under these circumstances, the IJ was not required to rehash all of the reasons why Vuktilaj failed to meet his burden with respect to that claim.  *See Karomi*, 168 F. App'x at 729 (finding substantial evidence to support denial of relief under the Convention Against Torture where the IJ's discussion of that claim was "brief").

III.

For these reasons, we deny the petition for review.