**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0591n.06

No. 07-4417

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Aug 21, 2009**
LEONARD GREEN, Clerk

| | |
|---|---|
| AMADOU TIDIANE SOUMARE, | ) |
| | ) |
| **Petitioner,** | ) **ON PETITION FOR REVIEW** |
| | ) OF A FINAL ORDER OF THE |
| v. | ) BOARD OF IMMIGRATION |
| | ) APPEALS |
| ERIC H. HOLDER, JR., United States | ) |
| Attorney General, | ) |
| | ) **O P I N I O N** |
| **Respondent.** | ) |
| | ) |

**Before: MOORE and WHITE, Circuit Judges; TARNOW, District Judge.**[*]

**KAREN NELSON MOORE, Circuit Judge.** Petitioner Amadou Tidiane Soumare ("Soumare") seeks review of an order of the Board of Immigration Appeals ("BIA") removing him to Mauritania. The Immigration Judge ("IJ") found that Soumare was not credible and was ineligible for asylum, withholding of removal, and relief under the Convention Against Torture. The BIA affirmed and adopted the reasoning of the IJ's decision. For the reasons discussed below, we **DENY** the petition for review of the BIA's decision.

**I. BACKGROUND**

Soumare, a native and citizen of Mauritania, was born in Nouadhibou, Mauritania, in 1972. A black Mauritanian of the Soninke ethnic group, Soumare lived with his family in Mauritania until

---

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

1989.[1] In 1989, he and other family members, along with other black Mauritanians in the neighborhood, were forcibly removed from their home by armed police and other White Moors. They were held at a mosque overnight, then taken to the airport and transported to neighboring Senegal.[2] The IJ generally credited this testimony and called it "a matter of historical record that large numbers of black Mauritanians in the period beginning around 1989 were forcibly deported from the country." J.A. at 28 (IJ Dec. at 14). Soumare stayed with his family at a refugee camp in Dagana, Senegal, for around two weeks and then went to Dakar, Senegal, while the rest of his family remained at the camp.

In March 1996, Soumare's father left the refugee camp in Senegal and returned to Mauritania in an attempt to reclaim the family's house in Nouakchott, which had been confiscated. One week later, Soumare learned from a sister living in Nouakchott that after returning his father had been arrested, tortured, and was now in a hospital in a coma. Soumare immediately returned to

---

[1]The State Department's 2005 report on Mauritania describes continuing discrimination against ethnic minorities including black Mauritanians:

> Racial and ethnic minorities faced societal discrimination. Racial and cultural tension and discrimination arose from the geographic and cultural divides between Moor and Black African. The Moors were divided among numerous ethno-linguistic tribal and clan groups and further distinguished racially as either White Moor or Black Moor, although it often was difficult to distinguish between the two by skin color. White Moor tribes and clans, many of whom were dark-skinned after centuries of intermarriage with Berbers and sub-Saharan African groups, dominated positions in government and business. . . . Concentrated in the south, the Halpulaar (the largest non-Moor group), the Wolof, and the Soninke ethnic groups were underrepresented in the military and security sectors.

Joint Appendix ("J.A.") at 173 (U.S. Dep't of State 2005 Country Report on Human Rights Practices: Mauritania at 12).

[2]In a revised statement attached to a supplemental I-589 filed on November 11, 2005, Soumare stated that he, his younger sister, father, and brother were deported in 1989. However, in his testimony before the IJ, Soumare indicated that it was his two sisters and father who were deported along with him.

2

Mauritania to visit his father and was able to visit him at the National Hospital. Soumare said that both of his father's legs were broken, his face was bruised, and he was unable to see or hear the family. His father died on April 27, 1996.

In 1997, Soumare joined the Action for Change ("AC") party after meeting with a friend of his late father's who was a senior member of the party. Soumare said that he joined the party because he "did not want [his] father to have died in vain and . . . wanted to join the fight to change the government and equal rights for black Mauritanians." J.A. at 189 (Supp. I-589 Stmt. at 2). Soumare worked in the youth section of the party, distributing flyers, holding meetings and working to recruit young men. In 2002, the government of Mauritania banned the AC party.[3] In 2003 or 2004, Soumare joined the Popular Progressive Alliance ("PPA"), which like the AC party was headed by Messaoud Ould Boulkhair.

In his original asylum application ("I-589") and an attached statement, in his supplemental I-589 and an attached revised statement, and in his testimony before the IJ, Soumare described three incidents that occurred upon his return to Mauritania. The first of these incidents took place in November 2001, when Soumare went to local authorities in an effort to reclaim his family's house. On November 5, 2001, Soumare was told by three Moor clerks at the State Office of Estates that he needed to bring his father's death certificate and proof of relationship. When Soumare returned with the required documents the following day, he was told that the house now belonged to a white Mauritanian. One of the Moor clerks then called him a thief and began pushing him, and Soumare

---

[3]Soon after joining the AC party in 1997, Soumare, who was trained as a telecommunications technician, was referred by the AC party's president, Messaoud Ould Boulkhair, to a job at the telecommunications company A.F.R.I.T.E.L. Soumare worked as a crew chief at A.F.R.I.T.E.L. until leaving Mauritania in July 2004.

began pushing back. The police soon arrived, arrested Soumare, and took him to a police station. When he protested his innocence, according to Soumare, one of the officers said "Skout Kahlouch" ("Shut up Negro"). J.A. at 189 (Supp. I-589 Stmt. at 2). The officers held Soumare for two days during which he was beaten, slapped in the face, stripped of his clothes and doused with cold water, and called "black." J.A. at 109 (Hr'g Tr. at 34:1–19); J.A. at 189 (Supp. I-589 Stmt. at 2).[4] He was ultimately released after his brother-in-law, a Moor, spoke to police on his behalf.

The second of the incidents occurred on May 9, 2004. Two police officers came to Soumare's workplace at A.F.R.I.T.E.L. and took him to the police station.[5] "When the chief got there [he] grabbed me by the neck and told me that I was doing work for a banned party and that I was still claiming that [the white Mauritanian's] house belonged to my family. I swore that the house belonged to my family. He then held me tightly by the back of my shirt, told me that he was closely watching my every move and threw me out the door." J.A. at 189 (Supp. I-589 Stmt. at 2). In his testimony before the IJ, Soumare added details that he did not mention in his I-589 statement. According to Soumare's testimony, the chief of police also forced him to sign something, another officer hit him in the stomach, and the chief threatened that he would "never see the sun anymore." J.A. at 119-20 (Hr'g Tr. at 44:17–45:15). According to Soumare, after this incident he began fearing for his life. He subsequently applied for a visa at the U.S. Embassy, which was granted on July 6, 2004.

---

[4]In his testimony before the IJ, but not in his I-589 statement, Soumare said that officers also hit him in the stomach. J.A. at 109 (Hr'g Tr. at 34:16–17).

[5]In his testimony before the IJ, Soumare stated that he was handcuffed and driven by the police to the station. J.A. at 119 (Hr'g Tr. at 44:2–4). However, in his I-589 statement Soumare stated that the police officers "asked me to follow them to their station where they kept me waiting until 2 P.M." J.A. at 189 (Supp. I-589 Stmt. at 2).

The third and final incident occurred on July 20, 2004, when Soumare returned from work to find his sister crying after police dropped off a summons ordering him to appear at the police station. Soumare testified that his sister believed the summons was related to his political activity and told him that if he didn't leave politics he "would end up like [his] father . . . arrested and killed." J.A. at 116-17 (Hr'g Tr. at 41:19–42:4). After hiding at his uncle's house, Soumare left Mauritania and traveled by land to Senegal before coming to the United States.

On August 2, 2004, Soumare was admitted to the United States on a nonimmigrant visitor visa that expired on February 1, 2005. On February 3, 2005, Soumare submitted an application for asylum, withholding of removal, and protection under the Convention Against Torture to the Department of Homeland Security ("DHS"). On March 24, 2005, DHS began removal proceedings against Soumare as an alien who has remained in the United States for a time longer than permitted. The IJ held a merits hearing on March 15, 2006, at which Soumare and a longtime friend of the family, Saidou Wane, testified. The IJ then entered an oral decision denying Soumare's applications for relief. First, the IJ found Soumare "not to be a fully credible witness." J.A. at 25 (IJ Dec. at 11). While acknowledging that Soumare's "testimony was for the most part, detailed, internally consistent and consistent with the asylum application and his statements," the IJ noted several discrepancies between Soumare's testimony and his written statements that in the "aggregate" gave him "concern about the overall credibility of the respondent, at least on key points." *Id.* The IJ cited the following inconsistencies:

- Soumare testified that in 1989, when his family was forcibly removed to Senegal, his father and his two sisters were with him. However, his written statement indicated that a *brother*, a sister, and his father were with him.

- Soumare testified that he saw his father only one time at the hospital after returning to Mauritania in 1996. However, in his written statement Soumare said that he was able to see his father every week from the time of the first hospital visit until his father's death.

- Soumare testified that he visited the housing authority on November 6, 2001. However, according to the IJ, Soumare's written statement indicated that this visit was on November 5, 2001.[6]

- Soumare testified that after his arrest on November 6, 2001, he was forced to strip to his underwear and cold water was thrown on him. However, in his written statement he indicated that he was stripped naked.

- Soumare testified that water was thrown on him each night of the two days he was held in 2001. Soumare's written statement, however, mentioned water being thrown on him only once, the morning after his arrest, rather than at night.

- Soumare testified that during his 2001 arrest he was hit in the stomach. His written statement did not indicate that he was hit in the stomach.

- Soumare testified that when he was arrested at his workplace on May 9, 2004, he was handcuffed, put in the car, and driven to the police station. However, Soumare's written statement indicated that police asked him to follow them to the police station, where he was kept waiting until 2 p.m.

- Soumare testified that an officer punched him in the stomach causing him to fall to the floor during his detention in 2004. However, his written statement did not mention being punched in the stomach during the 2004 detention.

In his analysis of past persecution, the IJ looked only to the 2001 and 2004 incidents and not the 1989 deportation because Soumare "returned voluntarily to Mauritania [in 1996], living and working in Mauritania for approximately eight years, at . . . a well paying job." J.A. at 29 (IJ Dec. at 15). The IJ first concluded that the 2001 incident was "not supported by credible testimony." *Id.*

---

[6]The IJ erred in finding an inconsistency on this point. Soumare's statements clearly indicated that he first visited the housing authority on November 5, 2001, but was then told that he needed to bring his father's death certificate and proof of relationship. He then returned the following day, November 6, at which time the incident leading to his arrest occurred. Consistent with these statements, Soumare testified before the IJ that he was arrested on November 6, 2001.

6

In the alternative, the IJ stated that the 2001 incident did not appear to rise to the level of persecution based on one of the protected grounds, because it occurred following Soumare's arrest for a "physical altercation between himself and housing authority officials." J.A. at 30 (IJ Dec. at 16). Next, the IJ found that the 2004 incident was also not supported by credible testimony. Specifically, the IJ cited discrepancies between Soumare's testimony and his written statement on the details of how he was taken into custody. Finally, the IJ found that the corroborating evidence was not sufficient to establish Soumare's claim of past persecution. Among other things, the IJ explained that Soumare should have supplied a statement from his sister who was a witness to many of these events. The IJ also found it "odd" that the summons that Soumare received on July 20, 2004, apparently required him to appear at 10 a.m. on that same day. J.A. at 33 (IJ Dec. at 19).

Next, the IJ found that Soumare did not establish that he had a well-founded fear of future persecution. The IJ noted that black Mauritanians, including Soninkes, have held positions in the Mauritanian government in recent years, that there was no evidence that members of the political party to which Soumare belonged were currently persecuted, and that a State Department report indicated that the government that took power after the 2005 coup had released numerous political prisoners.

Finally, the IJ denied withholding of removal and protection under the Convention Against Torture. Because Soumare had failed to show eligibility for asylum, the IJ concluded that Soumare had necessarily failed to meet the higher burden for withholding of removal. The IJ also denied relief under the Convention Against Torture, finding no evidence in the record that Soumare would be tortured if returned to Mauritania and noting that Soumare's past treatment did not appear to rise to the level of torture.

7

Soumare appealed to the BIA, which affirmed the IJ's decision on October 22, 2007. The BIA found that the IJ's "adverse credibility finding, which was based on inconsistencies involving matters such as the nature, circumstances, and severity of the harm which the respondent allegedly suffered, is supported by the record." J.A. at 6 (BIA Dec. at 1). Citing the absence of credible testimony, the BIA concluded that Soumare did not adequately demonstrate past persecution or a well-founded fear of future persecution. In sum, the BIA stated that "[i]nasmuch as we are in agreement with the Immigration Judge's decision, we affirm his decision based upon and for the reasons set forth therein." J.A. at 7 (BIA Dec. at 2). Finally, the BIA rejected Soumare's claim on appeal that his due-process rights had been violated because the IJ entered a "partial adverse credibility finding" that was not supported by the record, and because the record contained numerous "indiscernibles" that prevented adequate appellate review. The BIA explained that the "the elements noted by the Immigration Judge in support of the 'partial' adverse credibility finding are sufficient to constitute an adverse credibility finding for this proceeding." *Id.*

Soumare timely filed this petition for review, arguing, among other things, that any discrepancies between his written statement and his testimony do not go to the heart of the matter. Soumare also argues, albeit perfunctorily, that his due-process rights were violated because the IJ denied asylum based on a "partially" adverse credibility determination. Soumare Br. at 22. Finally, citing the numerous "indiscernible" notations in the record, Soumare suggests that the record may be inadequate for appellate review.

8

## II. ANALYSIS

### A. Asylum Claim

The Attorney General may grant asylum to a "refugee," defined as a person "who is unable or unwilling to return to" his country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). In order to establish refugee status, an applicant must show either past persecution or a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b). "The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii). "'[W]here it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided. . . . The absence of such corroborating evidence can lead to a finding that an applicant has failed to meet her burden of proof.'" *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004) (quoting *In re S-M-J-*, 21 I. & N. Dec. 722, 724-26 (B.I.A. 1997)).

We review adverse credibility findings under the following standard:

> Credibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard. *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004). This is a deferential standard: A reviewing court should not reverse "simply because it is convinced that it would have decided the case differently." *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992) (internal citations omitted). While an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons. *See Daneshvar v. Ashcroft*, 355 F.3d 615, 623 n.7 (6th Cir. 2004); *Gao v. Ashcroft*, 299 F.3d 266, 276 (3d Cir. 2002) ("The reasons must be substantial and bear a legitimate nexus to the finding."). An adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They "cannot be based on an irrelevant inconsistency." *Daneshvar*, 355 F.3d at 619 n.2

9

(6th Cir. 2004). "If discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Id.* at 623 (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000)).

*Sylla v. INS*, 388 F.3d 924, 925-26 (6th Cir. 2004).[7]  "While it is true that irrelevant inconsistencies cannot constitute the basis for an adverse credibility determination, discrepancies may be relevant if they can be viewed as attempts by the applicant to enhance his claims of persecution." *Ndrecaj v. Mukasey*, 522 F.3d 667, 674-75 (6th Cir. 2008) (internal quotation marks and citations omitted). When, as here, the BIA adopts the reasoning of the IJ's opinion but makes additional comments, we review the IJ's decision but also consider the additional comments of the BIA. *Elias v. Gonzales*, 490 F.3d 444, 449 (6th Cir. 2007). Although several of the discrepancies identified by the IJ do not go to the heart of the matter and cannot support an adverse credibility finding, we believe that the discrepancies related to Soumare's arrests in 2001 and 2004 do go to the heart of the matter and support the conclusion of the IJ and BIA that Soumare is not credible.

First, Soumare testified before the IJ that he was punched in the stomach by police during his detention in 2001 and again during his detention in 2004. However, Soumare's I-589 statement failed to mention this fact, even though it provided specific details about other mistreatment allegedly suffered by Soumare during the 2001 and 2004 detentions. Because being hit in the stomach would have been the most serious physical abuse suffered by Soumare during his detentions in 2001 and 2004 and because Soumare's claim of persecution depends largely on the abuse he

---

[7]The REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231, amended the standard for credibility determinations to provide that a trier of fact may make a credibility determination "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii); *see Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006). This change applies only to asylum applicants who file for relief on or after May 11, 2005. Because Soumare applied for asylum on February 3, 2005, the change does not apply, and the adverse credibility finding must be based on issues that go to the heart of his claim.

suffered during those detentions, we cannot say that the IJ clearly erred in finding these omissions to be substantial discrepancies that go to the heart of Soumare's asylum claim. Although these discrepancies are omissions rather than affirmative inconsistencies, these omissions are "substantially related to [Soumare's] asylum claim" and therefore may support an adverse credibility determination. *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005). Second, Soumare provided inconsistent accounts of the circumstances of his arrest in 2004. Whereas Soumare testified that police handcuffed him and drove him to the police station, his written statement asserted that police merely asked him to follow them to the station. Although there may be some conceivable explanation for this discrepancy, a reasonable adjudicator could find that this is a significant discrepancy that goes to the heart of the matter.

"While an adverse credibility finding alone will not defeat a claim for asylum, it will undermine a claimant's efforts to meet his burden of proof—particularly when the claimant reasonably could have presented, but did not present, corroborating evidence to support the claim." *Vuktilaj v. Mukasey*, 277 F. App'x 545, 549 (6th Cir. 2008) (unpublished). The IJ found that Soumare reasonably could have presented a statement from his sister, who was a witness to many of the events to which Soumare testified. On the record before us, we cannot find support for the IJ's finding that a corroborating statement from Soumare's sister was reasonably available. The record does not show, for instance, whether Soumare has received supporting documents from Mauritania in the mail or whether he has remained in contact with his sister or other family members since arriving in the United States. *See Dorosh*, 398 F.3d at 383 (upholding corroboration requirement where petitioner remained in contact with mother in country of origin but failed to obtain affidavit from her); *Vuktilaj*, 277 F. App'x at 550 (upholding corroboration requirement where

11

petitioner had received documents from country of origin, had cousin who had visited country twice since petitioner's arrival in United States, and had obtained documents from that country after arriving in United States).

In light of the IJ's adverse credibility determination, however, we conclude that substantial evidence supports the IJ's finding that Soumare failed sufficiently to corroborate his claim. Soumare submitted the testimony of a family friend and several documents, including identification cards, a statement from the Secretary General of the Action for Change ("AC") party concerning Soumare's participation in that group, his father's death certificate, and a medical certificate documenting treatment for the injuries he allegedly suffered during his detention in 2001. Although the IJ found that the record "contain[ed] some useful corroboration on some points," the IJ concluded that this evidence was insufficient to establish Soumare's claim. J.A. at 31 (IJ Dec. at 17). The statement from the General Secretary of the AC party, dated July 8, 1998, stated that Soumare was often the victim of arbitrary brutality and harassment from police and political officials because of his involvement in the AC party. However, the IJ questioned the veracity of this document because, according to Soumare's own testimony, it was not until 2001 that he was subjected to mistreatment by the police because of his political activities. The IJ did not question the authenticity of Soumare's father's death certificate or of Soumare's 2001 medical certificate, but found that each lacked sufficient detail to meaningfully advance Soumare's claim. The death certificate did not state the cause of Soumare's father's death, and the medical certificate "did not contain any specific information on the type of treatment [Soumare] was given or the type of mistreatment which le[d] to the medical treatment." J.A. at 32 (IJ Dec. at 18).

In sum, because the record does not compel us to reach a conclusion contrary to the IJ's adverse credibility finding, we must conclude that Soumare has not met his burden to prove eligibility for asylum. Because we affirm the IJ's findings regarding Soumare's eligibility for asylum, Soumare necessarily cannot meet the "more stringent standard" for establishing a claim of withholding of removal. *Liti*, 411 F.3d at 641 (internal quotation marks omitted). Finally, because no credible evidence in the record demonstrates that Soumare "'more likely than not . . . would be tortured if removed to" Mauritania, he also cannot establish entitlement to relief under the Convention Against Torture. *Id.* (quoting 8 C.F.R. § 1208.16(c)(2)).

## B. Due-Process Claim Regarding "Partial" Adverse Credibility Determination

In a section of his brief on appeal that otherwise addresses the IJ's adverse credibility determination, Soumare makes a cursory reference to a due-process violation. *See* Soumare Br. at 22 ("The Immigration Judge . . . violat[ed] . . . Petitioner's Due Process rights when he made what he characterized [as] a partially adverse credibility determination. A denial of asylum relief based on a partially adverse credibility determination is a novel finding which is not supported by any asylum law."). Because this issue was raised in a cursory manner without any citation or development of argument, we deem the issue waived. *See United States v. Sandridge*, 385 F.3d 1032, 1035 (6th Cir. 2004) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)). In any event, although the IJ found Soumare partially credible, with regard to petitioner's crucial encounters with Mauritanian authorities, the IJ found that Soumare's testimony was fatally discrepant.

13

## C. Adequacy of Record

Finally, Soumare alleges that the numerous "indiscernibles" in the transcript of his hearing before the IJ render the record inadequate for appellate review. Soumare does not clearly articulate a legal theory for his claim, but simply cites the statutory provision and regulations providing that a complete record must be kept of removal proceedings. Soumare Br. at 35; *see* 8 U.S.C. § 1229a(b)(4)(C) ("[A] complete record shall be kept of all testimony and evidence produced at the proceeding."); 8 C.F.R. § 1003.5(a) (providing that, when there is an appeal, the IJ shall forward the record to the BIA upon request); 8 C.F.R. § 1240.9 (providing that the hearing before the IJ shall generally be recorded verbatim). Typically, however, such claims are raised as procedural-due-process violations. *See, e.g.*, *Garza-Moreno v. Gonzales*, 489 F.3d 239, 241-42 (6th Cir. 2007). Accordingly, we assume that Soumare is asserting a due-process challenge based upon the inadequacy of the record.

"We review de novo alleged due process violations in immigration proceedings." *Garza-Moreno*, 489 F.3d at 241. To succeed on a due process challenge to removal proceedings, the petitioner must show both "error and substantial prejudice." *Id.* (internal quotation marks omitted). An error in the proceedings does not render the proceedings constitutionally defective unless the error "might have led to a denial of justice." *Id.* (internal quotation marks omitted). We previously have expressed "'concern that the government failed to meet its obligation [under 8 U.S.C. § 1229a(b)(4)(C)] to prepare a reasonably accurate and complete record of the removal hearing.'" *Garza-Moreno*, 489 F.3d at 241 (quoting *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006)). However, "a mere failure of transcription, by itself, does not rise to a due process violation." *Id.* (internal quotation marks omitted). Instead, the petitioner must show "specific prejudice to his

14

ability to perfect an appeal." *Id.* at 242 (internal quotation marks omitted). Soumare cites the large

number of "indiscernibles" in the hearing transcript, but he does not identify particular facts missing

from the transcript that would support his applications, nor does he point to a single argument that

he was unable to make before the BIA or this court because of the incomplete transcript. In sum,

because Soumare has not identified how the "indiscernibles" in the hearing transcript prejudiced his

ability to perfect an appeal, we conclude that Soumare has not demonstrated a due-process violation.[8]

### III. CONCLUSION

For these reasons, we **DENY** the petition for review.

---

[8] In the same section of his brief, Soumare contends that the IJ failed to make credibility determinations as to all of the supporting evidence submitted by Soumare. Soumare does not advance a distinct legal theory for this argument, and it appears to be a repackaged challenge to the IJ's adverse credibility determination. As explained above, the IJ's adverse credibility finding is supported by substantial evidence. Moreover, Soumare fails to identify any specific evidence that the IJ allegedly disregarded. The IJ gave a detailed explanation of his adverse credibility finding regarding the discrepancies between Soumare's testimony and written statements. Similarly, the IJ provided a detailed evaluation of the corroborating documentary evidence submitted by Soumare, explaining the weight given to various documents and his reasons for concluding that this evidence was insufficient to establish Soumare's asylum claim.

**TARNOW, District Judge, dissenting.** I dissent, because I believe that the IJ's adverse credibility determination was not supported by substantial evidence, and because I remain convinced that Soumare has shown that he suffered persecution in the past.

## I. Adverse credibility finding

The IJ focused on minor discrepancies between the written statement and the hearing testimony, which are not inexplicably inconsistent: the two are reconcilable.[1] And because other evidence corroborates Soumare's testimony, any reasonable adjudicator would be compelled to find that Soumare was credible. *See Yu v. Ashcroft*, 364 F.3d at 703 (in reviewing an adverse credibility finding, courts reverse only if any reasonable adjudicator would be compelled to conclude to the contrary).

### A. 2001 Arrest

The first discrepancy is that Soumare testified that he was hit in the stomach during the 2001 arrest, but his written statement did not mention this fact. As the IJ explained, "his written statement simply talked about being grabbed by the shirt and thrown out the door, and did not indicate that he was struck in the stomach on that occasion, nor physically abused in any other way other than being doused with the water." J.A. at 27 (IJ Dec. at 13).

But the failure to mention the stomach punch in the statement is not an inconsistency: Soumare (or his translator) could have just mistakenly omitted the stomach punch from his statement. There is a difference between an omission and an irreconcilable inconsistency.

---

[1]Because the discrepancies are reconcilable, I agree with the majority that we should decline to grant petitioner's alternative request that we remand due to the presence of "indiscernibles" throughout the transcript of the hearing before the IJ. Although some of the failures in transcription occur at important moments in the hearing, the transcript shows enough for me to realize that there is no contradiction between the written statements and the hearing testimony.

Moreover, this is not an omission that, along with the other relevant omissions, is "significant enough to support an adverse credibility determination." *Mece v. Gonzales*, 415 F.3d 562, 573 (6th Cir. 2005). This is so, because Soumare provided an examining doctor's statement, which shows that the petitioner had suffered "injuries due to violent treatment while in prison" after the 2001 arrest. *See* J.A. at 265. This doctor's statement corroborates Soumare's testimony that he was punched. Thus, there is an independent reason to believe Soumare's testimony, which minimizes the significance of the difference between the asylum-application statement and the testimony.

Though the government regards the doctor's note as merely a form medical statement, I reject such a characterization. The statement is dated within a few days of Soumare's 2001 arrest. There is no basis for suspecting that such a contemporaneous statement, offered by a doctor affiliated with the health ministry of the Mauritanian government, no less, is unreliable. And although the statement does not specifically outline what petitioner's injuries were, the fact that Soumare received medical attention and that the doctor said that the injuries were "due to violent treatment while in prison" speak to the seriousness of Soumare's injuries.

One last point about the 2001 arrest. The remaining, relevant elements were consistently rendered both in the written statement and in the testimony before the IJ. Both the statement and Soumare's testimony explain that Soumare was slapped in the face by the police chief. Both the statement and testimony show that Soumare was attempting to reclaim his family home, the same home that his father had tried to reclaim and for which his father was beaten so severely that he died soon afterwards. The evidence compels the conclusion that it was not merely a housing dispute or a disturbance of the peace that resulted in Soumare's arrest. Rather, the record is infused with evidence that the arrest and subsequent abuse occurred because Soumare, as a black Mauritanian,

17

was attempting to assert rights that government officials wanted to deny. Both the written statement and the testimony indicate that Soumare was released only after the intervention of his brother-in-law, a White Moor.

### B. 2004 Arrest

The other two relevant discrepancies relate to Soumare's 2004 arrest at his workplace. First, the IJ noted that, as with the 2001 incident, Soumare testified to being hit in the stomach during this incident, but did not mention this fact in his statement. Here again, this discrepancy does not mean that the written statement and testimony are inconsistent. The discrepancy simply indicates that the detail about the 2004 stomach punch was omitted. Soumare gave an explanation for this omission: he thought that the translator wrote in the asylum-application statement all of the details Soumare reported. *See* J.A. at 132 (IJ Hrg. at 57) ("I thought the person who was writing every detail."). In view of the internal consistency of most of Soumare's testimony, acknowledged even by the IJ, as well as the corroboration of the 2001 incident, a reasonable fact-finder would have to conclude that missing details about Soumare's physical treatment during the 2004 arrest do not give rise to the conclusion that this omission is significant enough to support an adverse credibility determination.

Besides, the gist of both the written statement and the testimony is that the police barged into Soumare's workplace two and a half years after his 2001 arrest at the housing authority, angry that petitioner worked for a banned political party, which agitated for the rights of black Mauritanians. His written statement indicates that the police were still annoyed in 2004 at his attempts to reclaim the family home from a White Moor. Given either of these reasons, the point is that Soumare was arrested for his work asserting the rights due to himself or others as black Mauritanians. While the detail about being punched in the stomach is omitted from the written statement's narration of the

18

2004 arrest, the key elements of the event are intact: that he was arrested on account of his race, ethnicity, or political activity.

Second, the IJ noted a discrepancy between Soumare's account of the circumstances of his 2004 arrest in his testimony and in his statement. Soumare testified that when police came to his workplace on May 9, 2004, they handcuffed him, put him in the car, and then drove him to the police station. However, in his written statement, Soumare said that the police simply asked him to follow them to the police station, where he was kept waiting until 2 p.m. This difference in narration does not present an inconsistency. It is entirely conceivable that the police approached Soumare, ordered him to follow them to the station, and subsequently handcuffed him and drove him to the station. There is no reason to presume an inconsistency between the written statement and Soumare's testimony.

In sum, given that omissions from the written statement are explainable or irrelevant, the IJ's factual determination — that Soumare was not credible — is not supported by substantial evidence. Rather, petitioner's testimony should have been credited.

As for petitioner's failure to provide a corroborating statement from his sister, I agree with the majority and would not find his failure to do so problematic. The question is not solely whether corroborating evidence is reasonably available, but whether it is reasonably expected. Because I believe that petitioner is credible and, in contrast to the majority's view, has already been corroborated by other evidence — such as the doctor's statement, the July 2004 summons,[2] his party-

---

[2]The IJ found it odd that the summons was delivered on the day that Soumare was to appear. We nor, we suspect, the IJ has any knowledge of police procedure in Mauritania. There is no reason to disbelieve the authenticity of the summons.

19

membership card, his father's death certificate, his pay stub[3] from AFRITEL, and the testimony of

his friend, Saidou Wane — a statement from Soumare's sister was not necessary, especially where

such a statement would necessarily be of limited corroborative value, given that it would have been

generated solely for the purpose of benefitting her brother's asylum claim.

## II. Past Persecution

I agree that were Soumare's testimony not to be credited, petitioner's other evidence alone

— without testimony to put that other evidence in context — would not suffice to show that he

suffered past persecution. But because I believe that the adverse credibility finding was unsupported

by substantial evidence, the other evidence strengthens my belief that petitioner has shown that he

suffered past persecution due to the 2001 and 2004 arrests. I would adjudicate the merits of whether

Soumare suffered past persecution notwithstanding *Pergega v. Gonzales*, 417 F.3d 623, 630–31 (6th

Cir. 2005) (remanding to BIA after reversing adverse credibility determination), because the BIA in

*Pergega* based its decision "solely on [the asylum applicant's] lack of credibility." In our case, on

the contrary, the IJ did offer an alternative basis for finding that Soumare failed to meet his burden

of showing past persecution. In my opinion, we therefore already have administrative action in the

first instance for us to review on a substantial-evidence standard.

According to the IJ, even assuming all of Soumare's testimony to be credible, the treatment

he described did not constitute persecution on account of one of the protected grounds under

8 U.S.C. § 1101(a)(42)(A). Discussing Soumare's 2001 arrest and subsequent abuse by police, the

IJ suggested that the incident arose out of an altercation between Soumare and housing authority

---

[3]The pay stub corroborates Soumare's testimony that he held a well-paying job in telecommunications. This bolsters the court's conclusion that he fled Mauritania due to persecution, not merely to seek a better economic life.

officials rather than on account of a protected ground.  I have already discussed why such an interpretation of the 2001 arrest is contrary to the record.  In his written statement, Soumare emphasizes that he met with resistance on account of his race.  Even as he was arrested in 2004, some two and a half years later, the policeman cited Soumare's claim to the family home as he grabbed Soumare's neck.  This was not merely a property dispute.

Next, the IJ indicated that he did not believe that the treatment Soumare received during his 2001 arrest rose to the level of persecution.  J.A. at 30 (IJ Dec. at 16).  But being arrested and physically harmed to a degree that warrants medical attention on account of one's race is enough for persecution.

## III. Well-Founded Fear of Future Persecution

Had Soumare shown that he suffered past persecution, he would have been entitled to a rebuttable presumption that he also has a well-founded fear of future persecution.  *Hernandez-Barrera v. Ashcroft*, 373 F.3d 9, 21 (1st Cir. 2004).  He could also have attempted to independently show that he has a well-founded fear of future persecution, apart from the presumption he is entitled to. *Id.*  Given the lapse in time since Soumare's testimony before the IJ, it is not reasonable to say whether Soumare has independently established a well-founded fear of future persecution.  We do not know, for instance, whether the government officials who threatened him with death, or other officials with similar animus towards black Mauritanians or Soumare in particular on account of a protected ground, are still in power, or whether continued political activity on behalf of black Mauritanians would subject him to persecution.  Accordingly, I only maintain that Soumare has provisionally established his eligibility for asylum based on his demonstration of past persecution. I would have  remanded to the BIA and ultimately to a different IJ, for consideration in the first

instance of whether the government can rebut the presumption that Soumare has a well-founded fear of future persecution. Where an IJ has erroneously found that an applicant is not credible, the appearance of fairness requires that the case be assigned to a new IJ on remand.

I note, though, the unpersuasiveness of many of the reasons that formed the basis for the IJ's conclusion that Soumare failed to show a well-reasoned fear of future persecution if he is removed to Mauritania. For example, the IJ noted that black Mauritanians, including Soninkes, had participated in the Mauritanian government in recent years. J.A. at 33 (IJ Dec. at 19). But some parliamentary representation for black Mauritanians does not rebut Soumare's experience, particularly given the July 2004 summons, where the police threateningly warned Soumare's sister that he should "leave the politics . . . or . . . would end up like [his] father." J.A. at 116 (IJ Hrg. at 41).

Though the IJ found no evidence in the record indicating that members of the political parties in which Soumare has participated were currently being persecuted in Mauritania, J.A. at 33 (IJ Dec. at 19), the AC party remained banned after the 2005 coup under the transitional government. J.A. at 167 (U.S. Dep't of State 2005 Country Report on Human Rights Practices: Mauritania at 6). And the head of the PPA, to which Soumare most recently belonged, is the same person who led the AC party.

Despite the IJ's observation that "the new leader who took over after the bloodless coup in 2005 has released numerous political prisoners in that country," J.A. at 33-34 (IJ Dec. at 19-20), Soumare testified that "[m]y only security there, it was my brother-in-law, who was protecting me most of the time. If he's not around . . . they can come and take me, I would disappear in a minute." J.A. at 136–37 (IJ Hrg. at 61–62).

22

I observe that, in order to establish a well-founded fear of future persecution, Soumare does not need evidence showing that members of his ethnic group (Soninke) or black Mauritanians in general or the party to which he belongs (PPA/APP) are targeted for persecution in Mauritania on a widespread basis. Nor is the presumption of a well-founded fear of future persecution necessarily rebutted by the fact that refugees from the 1989-91 crisis (in which Soumare's family was deported) continued to return to Mauritania from Senegal, with many refugees able to reclaim their original homes and land. J.A. at 168 (U.S. Dep't of State 2005 Country Report on Human Rights Practices: Mauritania at 7). What matters is an examination, subjectively and objectively, of Soumare's situation. *See Corado v. Ashcroft*, 384 F.3d 945, 947 (8th Cir. 2004) (per curiam) (a "specific, credible, immediate threat of death" on account of a protected ground can be "persecution" even if only a single incident occurs), *cited in Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005) (per curiam); J.A. at 288 (Original I-589) ("I fear physical abuse by the national police because of my past encounters with them and because I left without authorization. The authorities *are still looking for me* in Nouakchott (Mauritania).") (emphasis added).

In the end, though, I would leave it to the BIA and the IJ to consider whether the government can rebut the presumption of a well-founded fear of future persecution.

Likewise, I would have remanded Soumare's withholding-of-removal claims.

23