NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0309n.06

No. 12-3819

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED
*Mar 28, 2013*
DEBORAH S. HUNT, Clerk**

ALBERTO MATIAS-PABLO;
OLVIDIO MATIAS-MENDOZA; and
GRACIELA MATIAS-MENDOZA,

     **Petitioners,**

v.

ERIC H. HOLDER, JR., Attorney
General,

     **Respondent.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON PETITION FOR REVIEW
OF A FINAL ORDER OF THE
BOARD OF IMMIGRATION
APPEALS

**O P I N I O N**

**Before: MOORE and STRANCH, Circuit Judges; HOOD, District Judge.**[*]

**KAREN NELSON MOORE, Circuit Judge.** In 1994, Petitioner Alberto Matias-Pablo

("Matias-Pablo") escaped an ongoing civil war in Guatemala and entered the United States without

authorization. Two of his children, Petitioners Graciela and Olvidio Matias-Mendoza ("Graciela"

and "Olvidio"), joined him in 2005, also entering the United States without authorization. The

government initiated removal proceedings, charging all three petitioners as removable for being

aliens present in the United States without being admitted or paroled. Following a hearing, the

Immigration Judge ("IJ") denied Petitioners' applications for asylum, withholding of removal,

protection under the Convention Against Torture ("CAT"), and voluntary departure. The Board of

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

Immigration Appeals ("BIA") affirmed, and Matias-Pablo, Graciela, and Olvidio now petition this court for review of the BIA's order. Because we conclude that the BIA's determinations are supported by substantial evidence, we **DENY** the petition for review.

## I.  BACKGROUND

Matias-Pablo, a native and citizen of Guatemala, entered the United States without authorization on or around March 30, 1994. Pet. Br. at 2. Matias-Pablo filed applications for asylum in 1994 and again in 1996. *See* A.R. at 496–97 (Form I-589). On March 20, 2008, the government initiated removal proceedings and filed a Notice to Appear that charged Matias-Pablo as removable under the Immigration and Nationality Act ("INA") for being an alien present in the United States without being admitted or paroled. *Id.* at 543–44 (Notice to Appear); *see* 8 U.S.C. § 1182(a)(6)(A)(i). Petitioners Graciela and Olvidio, Matias-Pablo's children, are also natives and citizens of Guatemala. They entered the United States without authorization on or around September 5, 2005. *See* A.R. at 804 (Notice to Appear); *id.* at 1162 (Notice to Appear). The government initiated removal proceedings against Olvidio on September 26, 2005, and against Graciela on October 12, 2005, charging both with removability for being aliens present in the United States without being admitted or paroled. *See id.* at 804 (Notice to Appear); *id.* at 1162 (Notice to Appear).

All three petitioners conceded removability as charged. *See* Pet. Br. at 3. Matias-Pablo sought relief in the form of asylum, withholding of removal, protection under the CAT, and in the alternative, for voluntary departure. A.R. at 147 (Hr'g Tr. at 33). Graciela and Olvidio had previously filed untimely applications for asylum, which they withdrew, instead seeking relief only

through withholding of removal and protection under the CAT, and in the alternative for voluntary departure. *See id.* at 40–41 (IJ Dec. at 2–3). The IJ heard all three petitioners' cases simultaneously at a hearing held on September 1, 2009, with additional testimony taken on November 18, 2009. *Id.* at 41 (IJ Dec. at 3).

At the hearing before the IJ, Matias-Pablo testified that in 1982, government soldiers arrived in his village and burned down its houses, believing that the residents sided with the guerrillas in the Guatemalan civil war. *See id.* at 209–10 (Hr'g Tr. at 92–93). Although Matias-Pablo was able to flee, the rest of his family was taken along with others and held hostage in a nearby church in the town of Todos Santos. *See id.* at 210–11 (Hr'g Tr. at 93–94). Matias-Pablo testified that many people were killed during this incident, and that women were raped by the soldiers. *Id.* at 212–13 (Hr'g Tr. at 95–96). Matias-Pablo's brother was killed by government soldiers because the government believed he had joined the guerrillas. *See id.* at 216–17 (Hr'g Tr. at 99–100). After his village was burned down, Matias-Pablo joined the government's Civil Patrol in order to demonstrate that he was not a member of the guerrillas. Matias-Pablo testified that he was "punished several times" by government officials while he participated in the Civil Patrol, including "suffer[ing] a lot of cold because [h]e didn't have enough clothes while patrolling." *Id.* at 218 (Hr'g Tr. at 101). Matias-Pablo also recalled a particular incident when he felt too ill to patrol, but the government soldiers grabbed him from his bed and forced him to stand in cold water for the entire night. *Id.*

Matias-Pablo eventually sought employment outside of his village in order to avoid the harassment from the Civil Patrol. *Id.* at 219 (Hr'g Tr. at 102). In February 1994, he was working

in Santa Lucia when he and approximately 75 to 80 others came across a checkpoint where soldiers were taking the men away while leaving the women and children. *Id.* at 222 (Hr'g Tr. at 105). Matias-Pablo fled, and though he was chased by one of the soldiers, he was able to escape. *Id.* at 223 (Hr'g Tr. at 106). Following this incident, Matias-Pablo joined a group of people who led him across the Mexican border, and he eventually crossed into the United States. *See id.* at 224–25 (Hr'g Tr. at 107–08). Matias-Pablo testified that he is afraid of returning to Guatemala because he fears that the Guatemalan government or its soldiers will try to harm him because they will think that he had sided with the guerrillas during the civil war. *See id.* at 233–34, 256–57 (Hr'g Tr. at 116–17, 139–40).

Graciela testified that prior to leaving Guatemala, she was mistreated by both Guatemalan soldiers and guerrillas, who would follow her on her way to school, hit her on the head, throw stones at her, and insult her. *See id.* at 264 (Hr'g Tr. at 147). When pressed to provide more specifics, Graciela stated that she remembered an incident when she was five years old when the military told her she was a liar, that they knew her father was in the home hiding, and that they would kill her or her mother if she did not tell the truth. *Id.* at 285 (Hr'g Tr. at 168). She could not provide further details other than that the military "would always threaten [her]." *Id.* at 286 (Hr'g Tr. at 169). She stated that she fears both the military and the guerrillas "because they have always made [her] fearful of death." *Id.* at 266 (Hr'g Tr. at 149).

Olvidio has no memories of his father from Guatemala. *See id.* at 318 (Hr'g Tr. at 200). He testified that he stopped going to school in Guatemala because the military and the guerrillas would

4

"mistreat" him and "throw rocks" at him. *Id.* at 319 (Hr'g Tr. at 201). Olvidio further stated that he was mistreated because the guerrillas thought he or his father belonged to the military, while the military believed his father was part of the guerrillas. *Id.* At first, Olvidio said that he understood that his father belonged to the guerrillas because this is what his mother told him. *Id.* He also stated that he never spoke directly with members of the military or the guerrillas who would come to his home. *Id.* at 320 (Hr'g Tr. at 202). He later stated that the soldiers did tell him directly that they wanted to kill his father. *Id.* at 339 (Hr'g Tr. at 221). Olvidio stated that he fears going back to Guatemala because he would be killed and suffer mistreatment "because [his] parents suffered a lot of mistreatment and harm, and disturbances were there, and [his family] was always hiding." *Id.* at 326 (Hr'g Tr. at 208).

Following the hearing, the IJ denied Petitioners all of their requested forms of relief. *See id.* at 71 (IJ Dec. at 33). The IJ found Matias-Pablo credible, but found Olvidio and Graciela not credible. *Id.* at 60–61, 63 (IJ Dec. at 22–23, 25). The BIA affirmed, agreeing with the IJ's findings that Matias-Pablo was not eligible for asylum because he did not demonstrate past persecution on account of a statutorily protected ground, and that he did not have a well-founded fear of future persecution, given that the Guatemalan civil war ended in 1996. *See id.* at 4 (BIA Dec. at 2); *id.* at 65–68 (IJ Dec. at 27–30). The BIA also adopted the IJ's analysis regarding Olvidio's and Graciela's applications for withholding of removal: the BIA agreed with the IJ that neither Graciela nor Olvidio had established that they suffered past persecution or that it was more likely than not that they would be threatened in the future if deported to Guatemala. *Id.* at 4 (BIA Dec. at 2); *id.* at 69 (IJ Dec. at

31). Matias-Pablo, Graciela, and Olvidio timely filed a petition for review of the BIA's decision with this court.

## II. ANALYSIS

### A. Standard of Review

We have jurisdiction pursuant to 8 U.S.C. § 1252 to review the BIA's decision affirming an IJ's denial of asylum, withholding of removal, and protection under the CAT. *See Singh v. Ashcroft*, 398 F.3d 396, 400 (6th Cir. 2005). "Where, as here, the BIA issued a separate opinion, rather than summarily affirming the IJ's decision, we 'review the BIA's decision as the final agency determination. To the extent the BIA adopted the immigration judge's reasoning, however, [we] also review[] the immigration judge's decision.'" *Hachem v. Holder*, 656 F.3d 430, 437 (6th Cir. 2011) (quoting *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009)). We review the IJ's and BIA's findings of fact for substantial evidence, and we "may reverse only if the decision was 'manifestly contrary to law,' 8 U.S.C. § 1252(b)(4)(C), that is, if the evidence not only supports a contrary conclusion, but indeed *compels* it." *Haider v. Holder*, 595 F.3d 276, 281 (6th Cir. 2010) (internal quotation marks omitted). The IJ's and BIA's findings of fact are considered "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998) ("[W]e may not reverse the Board's determination simply because we would have decided the matter differently."). The same standard applies to the IJ's credibility determinations. *See Khozhaynova v. Holder*, 641 F.3d 187, 191 (6th Cir. 2011).

**B. Matias-Pablo's Claims for Relief**

Matias-Pablo argues that he has met the standards required to be granted asylum as well as withholding of removal under both the INA and the CAT. As a preliminary matter, because Petitioners expressly waived their right to appeal to the BIA their claims to relief under the CAT, *see* A.R. at 18 (Resp. BIA Br. at 4), we need not address Matias-Pablo's CAT-related arguments. *See* 8 U.S.C. § 1252(d)(1) (stating that orders of removal are reviewable only if "the alien has exhausted all administrative remedies available to the alien as of right"); *Ramani v. Ashcroft*, 378 F.3d 554, 560 (6th Cir. 2004) (holding that "only claims properly presented to the BIA and considered on their merits can be reviewed by this court in an immigration appeal").

In order for Matias-Pablo to be eligible for asylum, he "must be a refugee, which means that [he] must be unwilling to return to his . . . home country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Stserba v. Holder*, 646 F.3d 964, 972 (6th Cir. 2011) (quoting 8 U.S.C. § 1101(a)(42)(A)). If an applicant is able to establish past persecution, we apply a rebuttable presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1). However, "[t]he government may rebut this presumption by showing, by a preponderance of the evidence, that conditions in the country have changed so fundamentally that the applicant no longer has a well-founded fear of future persecution." *Bi Xia Qu v. Holder*, 618 F.3d 602, 606 (6th Cir. 2010). Further, the asylum applicant must establish "a link between the acts of persecution and the petitioner's protected-group identity." *Stserba*, 646 F.3d at 972. This requires that the applicant

7

demonstrate that he "was specifically targeted by the government for abuse based on a statutorily protected ground," as opposed to being the victim of indiscriminate violence or mistreatment. *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005). If the applicant can show that he meets the definition of a refugee, he also "bears the burden of establishing that the favorable exercise of discretion [by the Attorney General] is warranted." *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1150–51 (6th Cir. 2010) (internal quotation marks omitted).

In order to qualify for withholding of removal under the INA, Matias-Pablo "faces 'a more stringent burden than what is required on a claim for asylum.'" *Urbina-Mejia v. Holder*, 597 F.3d 360, 365 (6th Cir. 2010) (quoting *Liti v. Gonzales*, 411 F.3d 631, 640 (6th Cir. 2005)). Withholding of removal requires the applicant to demonstrate that "there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Singh*, 398 F.3d at 401 (internal quotation marks omitted). This requires a showing that the applicant's "life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b).

The BIA, agreeing with the IJ, found that Matias-Pablo did not establish that the mistreatment he suffered in Guatemala was on account of a statutorily protected ground, and that accordingly, he could not establish past persecution to support his claim for asylum. *See* A.R. at 4 (BIA Dec. at 2). Matias-Pablo challenges this determination, arguing that he demonstrated that the persecution he suffered was based on political opinion or race. *See* Pet. Br. at 8. Upon review, we hold that

substantial evidence supports the BIA's finding that Matias-Pablo did not demonstrate that there was a nexus between the harms he suffered and a statutorily protected ground.

The Supreme Court has held that "forced recruitment" by Guatemalan guerrillas "in order to carry on their war against the government and pursue their political goals" does not necessarily amount to persecution on account of political opinion. *INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992). The *Elias-Zacarias* Court held that in order to meet the "on account of" prong of asylum eligibility, an applicant must demonstrate that the persecution he suffered was "on account of the *victim's* political opinion, not the persecutor's." *Id.*; *see Pascual v. Mukasey*, 514 F.3d 483, 487 (6th Cir. 2007) (holding that a government's conscription of its citizens into military service and "punish[ment of] those who do not fulfill their duty . . . does not by itself ordinarily rise to the level of persecution on the basis of political opinion"); *Mateo v. Gonzales*, 217 F. App'x 476, 483 (6th Cir. 2007) ("Although Mateo might have refused to join the guerrillas because he opposed their tactics, his refusal does not necessarily lead to an inference that he was threatened by the guerrillas on account of his political opinion."). Accordingly, that Matias-Pablo suffered harm while participating in the Civil Patrol does not necessarily demonstrate persecution based on the expression of a political opinion. *See Elias-Zacarias*, 502 U.S. at 482. The BIA found instead that Matias-Pablo "was forced to participate in the civil patrol because all the men in his village were required to participate in order to assist the Guatemalan army in securing the country from the guerrillas." A.R. at 4 (BIA Dec. at 2). This finding is supported by Matias-Pablo's testimony at the hearing that he was "obligated" to join the Civil Patrol, and that "[e]verybody had to do it," or else they would

be beaten. *Id.* at 209, 214 (Hr'g Tr. at 92, 97). There is no indication in the record that the guerrillas sought to punish Matias-Pablo based on his political beliefs. Rather, the harm Matias-Pablo suffered in Guatemala at the hands of the Guatemalan government appears to have been based on the mandatory nature of participation in the Civil Patrol, and the government's generalized mission to combat the guerrillas. Thus, the record does not compel reversal of the BIA's determination that the harms Matias-Pablo suffered were not on account of a political opinion.[1]

Matias-Pablo also argues that the persecution he suffered was on account of his race as a Mayan, contending that the "the soldiers singled out the Mayans, including [Matias-Pablo], for harsh treatment due to their race." Pet Br. at 13. He points to his asylum application, in which he wrote that he "suffered threats and intimidation at the hands of the military who hunted and apprehended hundreds of people all Mayan Mam like myself." A.R. at 443 (Form I-589 at 5). However, although the IJ credited Matias-Pablo's account of the military's raids on his village, the IJ noted that Matias-Pablo had offered no testimony to establish that the villages were being pillaged because the inhabitants were Mayan. *See id.* at 65 (IJ Dec. at 27 n.7). Instead, the testimony indicates that the burning of the villages and the bombing that affected Matias-Pablo were part of the general civil strife during the Guatemalan civil war. We recognize that Matias-Pablo and his family may have suffered losses during the war, a time during which some Guatemalans may have suffered because

---

[1]We also reject Matias-Pablo's contention that the IJ erred by not considering the testimony of Graciela and Olvidio as corroborating evidence for his claims. *See* Pet Br. at 14. The IJ's adverse credibility finding as to Graciela and Olvidio is supported by substantial evidence, *see infra* Part II.C, and accordingly, the IJ need not have credited their testimony.

of their Mayan identity. *See Domingo-Francisco v. U.S. Atty. Gen.*, 322 F. App'x 849, 851 (11th Cir. 2009) (noting "the published reports and articles of record, including the country report, support an inference that [the petitioners] could have suffered violence because of their Mayan identit[ies]"). But we are constrained by the substantial-evidence standard. The testimony and other evidence that Matias-Pablo has offered, alone, does not compel the conclusion that Matias-Pablo suffered past persecution on account of his Mayan race. *See Haider*, 595 F.3d at 281.

We also conclude that the BIA's determination that Matias-Pablo did not establish a well-founded fear of future persecution is supported by substantial evidence. The BIA found that "[t]here is no proof in the record that anyone seeks to harm the lead respondent based on his past service in the civil patrol" and that "[a]part from the lead respondent's speculations, the record lacks evidence indicating that anyone in Guatemala may currently seek to harm him upon his return." *Id.* at 4 (BIA Dec. at 2). We have held that "an applicant cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual persecution." *Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007) (internal quotation marks omitted); *see also Daneshvar v. Ashcroft*, 355 F.3d 615, 624–25 (6th Cir. 2004) (rejecting a petitioner's application for asylum even though the evidence indicated that there was "widespread human rights abuse by the Iranian government," because the petitioner "presented no credible evidence that he will be singled out for different treatment if he is deported back to Iran").

The civil war ended in Guatemala in 1996. *See* A.R. at 427 (1997 Country Rep. at 2). Guatemala is now a democratic republic, and the 2008 Country Report stated that "there were no reports that the government or its agents committed any politically motivated killings." *Id.* at 398 (2008 Country Rep. at 1). In a series of similar cases, this court has rejected claims of a fear of future persecution in Guatemala because of the long passage of time since the ending of the civil war. *See, e.g.*, *Mendez-Coronado v. Holder*, 374 F. App'x 601, 605 (6th Cir. 2010); *Ralios Morente v. Holder*, 401 F. App'x 17, 23 (6th Cir. 2010); *Velasquez-Garcia v. Holder*, 336 F. App'x 517, 523 (6th Cir. 2009); *Pascual*, 514 F.3d at 488. Matias-Pablo has provided no specific information about why the government would believe he had joined the guerrillas, or that either former guerrillas or former military officials will seek to harm him if he returns to Guatemala. Accordingly, the evidence does not compel a reversal of the BIA's determination that Matias-Pablo did not demonstrate a well-founded fear of future persecution. Because Matias-Pablo cannot demonstrate either past persecution on account of a statutorily protected ground or a well-founded fear of future persecution, he cannot succeed on his claim for asylum. *See Stserba*, 646 F.3d at 972. Furthermore, because Matias-Pablo has not met the requirements for establishing eligibility for asylum, he also cannot meet the heightened requirements for withholding of removal. *See Berri v. Gonzales*, 468 F.3d 390, 397 (6th Cir. 2006).

## C. Graciela's and Olvidio's Claims for Relief

Next, Petitioners argue that the IJ erred by finding that neither Olvidio nor Graciela provided credible testimony regarding their claims for withholding of removal. *See* Pet. Br. at 18. "An

immigration judge's credibility determination is considered a finding of fact and is thus reviewed under the deferential substantial-evidence standard." *Kaba v. Mukasey*, 546 F.3d 741, 748 (6th Cir. 2008); *see Khozhaynova*, 641 F.3d at 193 ("We review the grounds relied upon by the immigration judge, and adopted by the Board, to determine whether the adverse credibility determination was supported by substantial evidence, or whether a reasonable adjudicator would be compelled to conclude to the contrary."). Because Olvidio's and Graciela's applications for withholding of removal were filed after May 11, 2005, the applications are covered by the credibility standards under the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302. *See El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009). "Under the REAL ID Act, credibility determinations are based on the 'totality of the circumstances' and take into account 'all relevant factors.'" *Id.* (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). The IJ may consider

> the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements . . . , the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii).

Here, the IJ's credibility determinations as to both Graciela and Olvidio are supported by substantial evidence. As to Graciela, the IJ found that her testimony was both vague and inconsistent. A.R. at 61 (IJ Dec. at 23). Graciela testified that the military and guerrillas would "always threaten [her]," *id.* at 286 (Hr'g Tr. at 169), and that the military and guerrillas would push

13

her and hit her in the head. *Id.* at 287 (Hr'g Tr. at 170). The IJ noted that Graciela could not provide details of specific incidents of threats or harassment. *Id.* at 61 (IJ Dec. at 23). She could only recall in detail one incident from when she was five years old, when officials came to her home claiming that her father was in the house hiding and that the officials would kill Graciela if she did not tell the truth. *See id.* at 285 (Hr'g Tr. at 168). The IJ explained that even this recollection was implausible, "because while [Graciela] claimed to have an accurate recollection of this incident, she also admitted that she has 'not too much, very little' memory of respondent Alberto in Guatemala 'because she was a child at the time.'" *Id.* at 61–62 (IJ Dec. at 23–24). The vague nature of Graciela's testimony lends support to the IJ's adverse credibility determination. *See Vuktilaj v. Mukasey*, 277 F. App'x 545, 549 (6th Cir. 2008).

Further, the IJ based his credibility determination on numerous admitted false statements and inconsistencies between Graciela's testimony at the hearing and her earlier statements to immigration officials. For example, Graciela testified that when she initially entered the United States, she did not know where her parents lived, and that her parents did not know she was coming to the United States. *See* A.R. at 289, 291–92 (Hr'g Tr. at 172, 174–75). However, she earlier told a border patrol agent that her father was to pay a smuggler when she arrived in Michigan, which indicates that her parents did know she was planning on entering the United States. *See id.* at 1167 (Form I-213 at 3). Graciela also admitted lying about her citizenship status when she was apprehended by immigration officials, *see id.* at 292 (Hr'g Tr. at 175), as well as lying about her age. *Id.* at 294 (Hr'g Tr. at 177). She testified that she made these false statements following the suggestion of others. *See id.* Finally,

14

she stated to immigration officials that she did not fear persecution or torture in Guatemala. *Id.* at 293 (Hr'g Tr. at 176). This is plainly inconsistent with her statements on her asylum application. *See id.* at 871–72 (Form I-589 at 5–6). Based both on the inconsistencies in Graciela's testimony, as well as her inability to provide details regarding specific incidents of threats or torture, a reasonable adjudicator would not be compelled to find Graciela's testimony credible. Accordingly, we may not reverse the IJ's finding. *See Khozhaynova*, 641 F.3d at 193–94.

The IJ's finding that Olvidio failed to testify credibly also is supported by substantial evidence. The IJ pointed out that "[Olvidio's] testimony was both internally and externally inconsistent." A.R. at 63 (IJ Dec. at 25). The IJ noted that Olvidio gave contradictory testimony as to whether the military officials and guerrillas told him directly that they wanted to kill Matias-Pablo, or whether Olvidio was told this information by his mother. *Compare id.* at 320–21 (Hr'g Tr. at 202–03) (stating that Olvidio never spoke directly with government officials or guerrillas), *with id.* at 339 (Hr'g Tr. at 223) (stating that men in uniforms told Olvidio "[m]any times" that they would kill his father). The IJ further noted inconsistencies between Olvidio's written applications and his oral testimony: Olvidio stated on his asylum application that he lived in Todos Santos from 1990 until 2003, but admitted at the hearing that this was not true, and that in fact he lived in Huehuetenango for most of this time, *see* A.R. at 335–36 (Hr'g Tr. at 217–18). Olvidio also failed to mention on his asylum application that he had a sister, Santos. *See* A.R. at 344–45 (Hr'g Tr. at 226–27). Under the REAL ID Act, these inconsistencies and inaccuracies are sufficient to support the IJ's determination that Olvidio was not a credible witness. *See Khozhaynova*, 641 F.3d at 194.

Additionally, the IJ found that both Graciela and Olvidio failed to provide corroboration for their testimony. *See* A.R. at 63–64 (IJ Dec. at 25–26). Such a failure to provide corroborating evidence when it is reasonably available may support an IJ's adverse credibility finding. *See Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004).

Accordingly, the IJ's findings support the IJ's conclusion that Graciela and Olvidio had not met their burden of proof to demonstrate eligibility for withholding of removal. *See Sako v. Gonzales*, 434 F.3d 857, 862 (6th Cir. 2006) ("Where the alien's testimony could be viewed as incredible, inconsistent, or incoherent, a fact-finder may reasonably conclude, absent corroboration, that the testimony is insufficient to meet the standard of proof required."). A reasonable adjudicator would not be compelled to conclude, on the record in this case, that there is a "clear probability" that Graciela and Olvidio would be subjected to persecution if forced to return to Guatemala. *Singh*, 398 F.3d at 401.

## III. CONCLUSION

For the foregoing reasons, we **DENY** Matias-Pablo, Graciela, and Olvidio's petition for review.