NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0571n.06

No. 19-3027

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 14, 2019
DEBORAH S. HUNT, Clerk

FLORINDA FLORIDALMA
GOMEZ-CHAVEZ, et al.,

      Petitioners,

v.

WILLIAM P. BARR, Attorney General,

      Respondent.

ON PETITION FOR REVIEW
FROM THE UNITED STATES
BOARD OF IMMIGRATION
APPEALS

BEFORE:    CLAY, THAPAR, and NALBANDIAN, Circuit Judges.

**CLAY, Circuit Judge.** Petitioner Florinda Gomez-Chavez, on behalf of herself and her minor child, seeks review from a decision of the Board of Immigration Appeals ("BIA") denying their application for asylum and withholding of removal, as well as their motion to terminate removal proceedings for lack of jurisdiction. *See* 8 U.S.C. §§ 1158, 1231(b)(3); 8 C.F.R. § 1003.14(a). For the reasons set forth below, we deny her petition for review.

## I.   BACKGROUND

Gomez-Chavez and her child are citizens of Guatemala. They entered the United States on May 5, 2014 after traveling through Mexico, and the following day were served with a notice to appear for removal proceedings, charging them with entering the country without being admitted by an immigration officer. The notice to appear did not include a date and time for her initial

hearing, and instead said it would occur "on a date to be set at a time to be set." (A.R. at 245.)[1]

Gomez-Chavez later received notices of hearings that included the dates and times of her immigration proceedings, with her first hearing set for September 9, 2014. Gomez-Chavez attended that hearing and all subsequent hearings.

At the September 9, 2014 hearing, the immigration judge continued her case to July 28, 2015 so that Gomez-Chavez would have time to retain a lawyer. On July 7, 2015, Gomez-Chavez—now represented by counsel—signed and submitted an application for asylum and withholding of removal. When asked why she did not file within the first year of her arrival in the United States, Gomez-Chavez said it was because she didn't know that she could. She appeared for a hearing later that month and formally filed the application with the court, and a hearing on the application's merits was set for October 11, 2017.

Gomez-Chavez's application was based on her fear of persecution for "[m]embership in a particular social group." (*Id.* at 189); *see also* 8 U.S.C. § 1231(b)(3)(A) ("[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's . . . membership in a particular social group . . . ."). At the October 11, 2015 hearing, Gomez-Chavez specified that her particular social group was "individuals with markers of wealth," and that gang members targeted her because of this perceived wealth. (A.R. at 112–13.)

Gomez-Chavez said she left Guatemala for the United States because she was being harassed by members of the "MS Gang" (presumably Mara Salvatrucha, or MS-13). (*Id.* at 98–99; *see also id.* at 137.) At the time, Gomez-Chavez was attending school and living with her sister.

---

[1] While at some points in her brief, Gomez-Chavez claims that her notice to appear also failed to specify a location for the immigration court, the notice did in fact include an address.

Her sister was known in her community for running a small store out of her house. The store was quite popular, as it was the only place to get basic supplies within an hour's walk.

Gomez-Chavez said that sometime between 2011 and 2013, her sister received a phone call from a man who said his name was Carlos Mendoza, whom she thought was a member of the MS Gang. Mendoza threatened Gomez-Chavez's sister and demanded 50,000 Guatemalan quetzals (about $6,500). He said if she did not pay, "he and his accomplices would hurt [their] family" and would kill Gomez-Chavez. (*Id.* at 99, 189.)

Gomez-Chavez's sister paid the money, but this only made Mendoza call again to ask for more. She also said that because Gomez-Chavez lived with her sister, they started to threaten her as well. The gang stole her nephew's truck and robbed her sister's store. When her sister refused to pay again, Mendoza and his associates raped Gomez-Chavez's niece. They filed a police report, "but nothing came of it," and the gang then threatened to do the same to Gomez-Chavez. (*Id.* at 189.) However, they never directly contacted Gomez-Chavez.

On the road she would walk along from her sister's house, Gomez-Chavez would see a group of men whom she believed were members of the gang. One time, they followed her and were walking behind her until she ran and jumped onto a departing bus.

Following these threats, and because the gang members had followed her, Gomez-Chavez moved in with her parents, about two hours away from her sister's home. While she never received threats at her parents' home, some cars would park on the road by the house, and Gomez-Chavez was afraid they were members of the gang. Her sister continued to receive calls, though, including some that threatened Gomez-Chavez. A few months after moving to her parents' house, Gomez-Chavez left for the United States, saying she feared for her safety and the safety of her daughter.

She did not think the government of Guatemala could protect her, nor did she think that she could move anywhere else within Guatemala to avoid persecution.

While the immigration judge found Gomez-Chavez to be credible, he denied her application for asylum and for withholding of removal. On the asylum claim, the court found that Gomez-Chavez filed her application more than one year after arriving in the United States and had failed to show extraordinary circumstances justifying the late filing. On withholding of removal, the court found that Gomez-Chavez failed to establish that she was persecuted or feared persecution on account of her asserted social group.

As noted in the State Department's country report for Guatemala, "[e]xtortions are common and target all sectors of society. Bus lines, markets, and small businesses are common targets; however, these gangs also target school children, street vendors, and private citizens." (*Id.* at 138.) Thus, the court found that the events Gomez-Chavez described reflect "the general violence and criminal activity plaguing Guatemala, including extortion, assaults, and other violent crimes committed by gang members." (*Id.* at 63.) Since the crimes in Gomez-Chavez's case were committed to further the gang's own interests, and not on account of Gomez-Chavez's asserted social group, they reflected "general conditions of crime and violence in Guatemala" and not "persecution on account of a protected ground." (*Id.* at 64.)

While the court said it was unnecessary to reach the question, it would have also found that her asserted social group "failed to meet the immutability, particularity, and social distinction requirements" for recognition under the law. (*Id.*) Also, even though Gomez-Chavez had not applied for relief under the Convention Against Torture, the immigration judge found she would not have been eligible. Accordingly, the immigration judge denied her application and ordered her removed to Guatemala.

Gomez-Chavez appealed to the BIA, raising several grounds for reversal. First, she argued that the immigration judge erred in finding that she had failed to establish persecution on account of her asserted social group. Second, she said that the court should have forgiven her late asylum application since she was never told about the deadline. Third, the immigration court lacked subject-matter jurisdiction because her original notice to appear did not include the date and time of her hearing, rendering it defective, and this defective notice also violated her right to due process.

The BIA denied Gomez-Chavez's appeal. Specifically, the BIA found that Gomez-Chavez "did not establish a nexus between the harm she fears and the protected ground at issue." (*Id.* at 3.) This is because the evidence suggested that "the threats and extortion were criminal acts to promote the gang's interest, and were not motivated by any protected ground. . . . While [Gomez-Chavez] may have a well-founded fear of harm from gang members, her fear is based on general conditions caused by criminal violence against the public." (*Id.* at 3–4.) The BIA made this finding under the more forgiving legal standard for asylum claims, and so did not address the timeliness of her application, since it would have been denied in either case. And because Gomez-Chavez did not meet the standard for asylum, she also could not meet the higher standard for withholding of removal. *See INS v. Cardoza-Fonesca*, 480 U.S. 421, 427–32 (1987) (holding that, for asylum, a noncitizen must only establish a "well-founded fear of persecution," whereas applications for withholding of removal must show a "clear probability of persecution"); *Urbina-Mejia v. Holder*, 597 F.3d 360, 365 (6th Cir. 2010) (same).

The BIA also rejected her arguments about the missing date and time on her notice to appear. According to the Board, because a notice of hearing containing that information was eventually sent to Gomez-Chavez, the immigration court had jurisdiction and could order her

removal. Thus, Gomez-Chavez's appeal was denied in its entirety, and so she petitioned this Court for review.

## II. DISCUSSION

On appeal, Gomez-Chavez claims that the BIA erred in finding that she had not established a nexus between her alleged persecution and the particular social group of which she claims to be a member, namely "individuals with markers of wealth." She also claims that her application should have been reviewed under the more forgiving standard for asylum seekers, even though it was filed after the deadline. Finally, she argues that because the date and time of her hearing were not included in her initial notice to appear, but instead provided in a later notice, the immigration court lacked jurisdiction and violated her right to due process. For the reasons discussed below, each of these arguments fails.

### A. Standard of Review

"On petitions from BIA decisions, we review questions of law *de novo*, but 'substantial deference is given to the BIA's interpretation of the INA and accompanying regulations.'" *Shaya v. Holder*, 586 F.3d 401, 405 (6th Cir. 2009) (quoting *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009)). This deference extends "to BIA interpretations of its own empowering statutes and regulations only, not to BIA interpretations of other state or federal laws." *Id.* Similarly, claims of due process violations are reviewed *de novo*. *E.g.*, *Gilaj v. Gonzales*, 408 F.3d 275, 290 (6th Cir. 2005) (per curiam); *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998).

On the other hand, we review the BIA's findings of fact for "substantial evidence" and will reverse its decision only "if the evidence 'not only supports a contrary conclusion, but indeed *compels* it.'" *Haider v. Holder*, 595 F.3d 276, 281 (6th Cir. 2010) (quoting *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003)); *accord, e.g.*, *Zaldana Menijar v. Lynch*, 812 F.3d 491, 497–98 (6th Cir. 2015); *see also* 8 U.S.C. § 1252(b)(4)(B) ("[The BIA's] findings of fact are conclusive

unless any reasonable adjudicator would be compelled to conclude to the contrary . . . .”). Whether an applicant for asylum or withholding of removal has established a nexus between the harm she suffered and her proposed social group is a question of fact. *E.g.*, *Zaldana Menijar*, 812 F.3d at 500–01; *Matias-Pablo v. Holder*, 518 F. App'x 407, 412 (6th Cir. 2013).

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination. To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Khalili*, 557 F.3d at 435 (citation omitted).

### B. Nexus Between the Alleged Persecution and the Proposed Social Group

Gomez-Chavez challenges the BIA's decision that she failed to establish her eligibility for asylum (and by extension, for withholding of removal). Specifically, the BIA found that she "did not establish a nexus between the harm she fears and the protected ground at issue, which is a particular social group, defined as 'individuals with markers of wealth who were extorted because of perceived wealth.'" (A.R. at 3 (quoting A.R. at 63).) Gomez-Chavez says this was wrong, and argues that the evidence and testimony she presented is enough to establish a "fear of persecution on account of her social group membership." (Pet'rs' Br. at 15.)

In *Sanchez-Robles v. Lynch*, we declined to recognize a similar social group of "persons who are perceived to have money or access to money due to having spent a significant amount of time in and having familial ties to the United States." 808 F.3d 688, 692 (6th Cir. 2015). The Court held that "the assumption that [the noncitizen] will be the target of persecution for economic gain" cannot establish a particular social group. *Id.*

In this case, however, the BIA—while referencing *Sanchez-Robles*—did not reach the question of whether Gomez-Chavez's proposed social group is cognizable under the law. (A.R. at

3.) Accordingly, we will not address it in the first instance. *See, e.g.*, *INS v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002) (per curiam) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter [in the first instance] that statutes place primarily in agency hands. This principle has obvious importance in the immigration context."); *Juan-Pedro v. Sessions*, 740 F. App'x 467, 473 (6th Cir. 2018) ("The Board did not address these issues, so we leave them to the Board to consider in the first instance on remand."); *Bi Xia Qu v. Holder*, 618 F.3d 602, 609 (6th Cir. 2010) (citing *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam)) (same); *Aoun v. INS*, 342 F.3d 503, 509 (6th Cir. 2003) (same).

But even if this proposed social group were legally cognizable, there is still substantial evidence to support the BIA's finding that Gomez-Chavez failed to establish a nexus between her membership in the group and her claimed persecution. As a result, we must deny Gomez-Chavez's petition for review.

In order to qualify for asylum, there must be "a link between the acts of persecution and the petitioner's protected-group identity." *Stserba v. Holder*, 646 F.3d 964, 972 (6th Cir. 2011). "It is not sufficient that the applicant has been subjected to indiscriminate abuse, . . . or has been the victim of a random crime. Instead, the applicant must establish that he or she was specifically targeted . . . for abuse based on one of the statutorily protected grounds." *Gilaj*, 408 F.3d at 285; *accord, e.g.*, *Matias-Pablo*, 518 F. App'x at 412; *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1137–38 (6th Cir. 2010).

In this case, Gomez-Chavez's evidence fails to support her claim that she was specifically targeted because of her markers of wealth. Her testimony notes that her sister operated a store out of her house and was known for this in her community. It also establishes that her sister was extorted and that her family was threatened and attacked. But never does Gomez-Chavez connect

these things and show that she was targeted on account of her perceived wealth, as opposed to her family being the random victims of gang violence.

According to Gomez-Chavez's own evidence, "[e]xtortions are common and target all sectors of society." (A.R. at 138.) Such "[g]eneral conditions of rampant gang violence alone are insufficient to support a claim for asylum." *Umana-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013); *see also, e.g.*, *Zaldana Menijar*, 812 F.3d at 501 ("[W]idespread crime and violence does not itself constitute persecution on account of a protected ground."); *Cano-Huerta v. Holder*, 568 F. App'x 371, 373 (6th Cir. 2014) (per curiam) (same). Accordingly, the BIA's rejection of Gomez-Chavez's asylum claim must be upheld.

## C. Deadline for Asylum Applications

Gomez-Chavez also argues that the immigration judge erred by deeming her asylum application late, and for that reason considering her application only as a request for withholding of removal. To be eligible for asylum, a noncitizen must "demonstrate[] by clear and convincing evidence" that her application was filed within one year of arriving in the United States, barring "extraordinary circumstances" or some other exception to the deadline. 8 U.S.C. § 1158(a)(2)(B), (D). Gomez-Chavez claims that such extraordinary circumstances are present here because "she was not informed of the obligation to file her asylum application within one year of entering the United States." (Pet'rs' Br. at 17.)

In support of this argument, Gomez-Chavez points to *Rojas v. Johnson*, 305 F. Supp. 3d 1176 (W.D. Wash. 2018), a case from the Western District of Washington. In *Rojas*, the district court held that federal agents violated the Immigration and Nationality Act based on Congressional intent and violated the Due Process Clause by failing to notify noncitizens of the one-year asylum

deadline.[2] *Id.* at 1181–87. While normally this Court lacks jurisdiction to review BIA decisions on timeliness of asylum applications, there is an exception for "constitutional claims or matters of statutory construction," *Ablahad v. Gonzales*, 230 F. App'x 563, 567 (6th Cir. 2007) (quoting *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006)), which Gomez-Chavez appears to be invoking by citing *Rojas*.

But while Gomez-Chavez complains that the immigration judge rejected her asylum application as untimely, the BIA did not reach this question, and instead denied the application on its merits. Accordingly, Gomez-Chavez's timeliness arguments are not properly before this Court. *See, e.g.*, *Juan-Pedro*, 740 F. App'x at 473 (declining to address issues decided by the immigration judge but not addressed by the BIA). And even if her claims were reviewable, Gomez-Chavez cannot show prejudice because her asylum application was denied on its merits, and so there is no need to address her timeliness claims. *See Erepadei v. Barr*, 772 F. App'x 321, 323 & n.1 (6th Cir. 2019) (holding that there was no need to address a noncitizen's *Rojas*-based claim because he was ineligible for asylum on the merits); *see also, e.g.*, *Dominguez-Gonzalez v. Holder*, 381 F. App'x 511, 514–17 (6th Cir. 2010) (rejecting a noncitizen's claim for failure to inform him of the right to seek asylum on the grounds that he had not shown prejudice); *Garza-Moreno v. Gonzalez*, 489 F.3d 239, 241 (6th Cir. 2007) (noting that a noncitizen must establish substantial prejudice in order to succeed on a due process claim); *Vasha v. Gonzales*, 410 F.3d 863, 872, 875 (6th Cir. 2005) (same).

### D. Failure to Include a Date and Time in the Notice to Appear

Moving beyond the merits of her application, Gomez-Chavez argues that her removal proceedings should be terminated because her notice to appear was defective. This is because the

---

[2] An appeal of this decision is currently pending before the Ninth Circuit. *Rojas v. Nielsen*, No. 18-35443 (9th Cir. filed May 25, 2018).

notice did not include the date and time of her initial hearing, instead saying it would occur "on a date to be set at a time to be set." (A.R. at 245.) Gomez-Chavez says this stripped the immigration court of subject-matter jurisdiction, basing her argument on the Supreme Court's decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018). She also claims that the defective notice violated her right to due process under the Fifth Amendment.

Both of these arguments fail. First, under several cases decided by this Court after *Pereira*, the immigration court properly has jurisdiction so long as the date and time of the hearing are provided through a later notice. *See, e.g.*, *Santos-Santos v. Barr*, 917 F.3d 486 (6th Cir. 2019); *Hernandez-Perez v. Whitaker*, 911 F.3d 305 (6th Cir. 2018). Second, Gomez-Chavez has failed to show any prejudice from the failure to include a date and time in the initial notice to appear, foreclosing her due process claim. Thus, her motion to terminate removal proceedings was correctly denied.

### 1. Jurisdiction of the Immigration Judge

Gomez-Chavez's first argument is that because of the defective notice to appear, the immigration judge lacked subject-matter jurisdiction over her claim. This argument is primarily based on a Department of Justice regulation that says "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court." 8 C.F.R. § 1003.14(a). Another regulation defines "charging document" to include a notice to appear. *Id.* § 1003.13.

But what constitutes a "notice to appear"? For that, a federal statute lists several things that a notice to appear is supposed to include. 8 U.S.C. § 1229(a)(1). And one of those things is "[t]he time and place at which the proceedings will be held." *Id.* § 1229(a)(1)(G)(i). A separate provision allows the immigration court to change the time and place of proceedings through a later notice. *Id.* § 1229(a)(2)(A).

The Department of Homeland Security ("DHS") has taken a relaxed view of this rule. In recent years, "almost 100 percent" of notices to appear have omitted the date and time of the hearing, and instead say the date and time will be set later. *Pereira*, 138 S. Ct. at 2111. This is exactly what happened with Gomez-Chavez.

In *Pereira v. Sessions*, the Supreme Court cast some doubt on this procedure. *Pereira* concerned something called the "stop-time rule," which itself is about whether a noncitizen can apply for cancellation of removal. 138 S. Ct. at 2110. To apply for cancellation, a noncitizen must have been continuously present in the United States for the ten years before she applies, but this time stops running "when the alien is served a notice to appear under [8 U.S.C. §] 1229(a)." *Id.* (quoting 8 U.S.C. § 1229b(d)(1)(A)).

The Court held that a notice without a date and time is not good enough, and so could not count as a notice to appear for the purpose of triggering the stop-time rule. *Id.* at 2113–16. But it's important to note what *Pereira* did not decide. In that case, the petitioner never received a supplemental notice with the date and time of his hearing until after he accrued ten years of continuous presence, *id.* at 2112, and so the Court had no chance to address whether a subsequent notice of hearing could cure the defect and forge a complete notice to appear.

In *Hernandez-Perez v. Whitaker*—a case decided after *Pereira*—this Court took up that question. Just as in this case, the notice to appear in *Hernandez-Perez* said the hearing would be "on a date to be set at a time to be set," and Hernandez-Perez was later sent a notice of hearing that provided the missing information. 911 F.3d at 311 & n.2. Hernandez-Perez argued that the defective notice meant jurisdiction never vested with the immigration judge, and so his removal proceedings should have been terminated. *Id.* at 310–11.

We found in *Hernandez-Perez* that the governing statutes and regulations were ambiguous as to whether the subsequent notice of hearing could cure the defect, and so deferred to the BIA's interpretation. *Id.* at 311–15 (citing *Bermudez-Cota*, 27 I. & N. Dec. 441, 447 (B.I.A. 2018)); *cf. INS v. Aguirre-Aguirre*, 526 U.S. 415, 424–25 (1999) (holding that BIA interpretations of the Immigration and Nationality Act are entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)); *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding that an agency's interpretation of its own regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation'" (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989))). Thus, we held that "jurisdiction vests with the immigration court where, as here, the mandatory information about the time of the hearing is provided in a Notice of Hearing issued after the [notice to appear]." *Hernandez-Perez*, 911 F.3d at 314–15. This Court also reiterated that holding in *Santos-Santos v. Barr*, again finding that jurisdiction vests with the immigration court when the date and time information is provided in a subsequent notice of hearing. 917 F.3d at 489–91.[3]

While Gomez-Chavez purports to "recognize[] the position of this Court" in *Hernandez-Perez* and *Santos-Santos* (Pet'rs' Br. at 25), she must also recognize that we are bound by these prior, published decisions, *e.g.*, *United States v. Porter*, 886 F.3d 562, 566 (6th Cir. 2018); *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 855 (6th Cir. 2017); *Salmi v. Sec'y. of Health*

---

[3] *Santos-Santos* alternatively held that the regulatory definition of "notice to appear" is different from the statutory requirements for that term, and does not include a date and time requirement. 917 F.3d at 490 (citing 8 C.F.R. § 1003.15(b)–(c)). Therefore, for purposes of the jurisdictional *regulation*, a notice to appear without any date or time information would still confer jurisdiction on the immigration court. *Id.* at 490–91 (citing *Karingithi v. Whitaker*, 913 F.3d 1158, 1159–62 (9th Cir. 2019)).

*& Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985); *accord* 6 Cir. R. 32.1(b). Accordingly, her claim that the immigration judge lacked jurisdiction must be denied.[4]

### 2. Procedural Due Process

Gomez-Chavez also argues that by not including the date and time in her original notice to appear, DHS violated her Fifth Amendment right to due process. Her claim is that by not including the date and time of the hearing, the document fundamentally failed to perform its function as a notice to appear, and so did not give her an adequate opportunity to defend herself in her immigration proceedings. But there is no need to reach the merits of this claim, because Gomez-Chavez has not shown that she was prejudiced by the alleged defect.

In order to succeed on a due process challenge, a noncitizen must show that she was prejudiced by the alleged violation. *E.g.*, *Garza-Moreno*, 489 F.3d at 241–42; *Vasha*, 410 F.3d at 872, 875. This means Gomez-Chavez must show that but for the violation, the outcome would have been different in her case. *E.g.*, *Mulla v. Holder*, 462 F. App'x 592, 595 (6th Cir. 2012); *Garza-Moreno*, 489 F.3d at 242; *Vasha*, 410 F.3d at 875; *see also Graham v. Mukasey*, 519 F.3d 546, 549–50 (6th Cir. 2008) ("[T]o establish the requisite prejudice, [a noncitizen] must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of those violations.").

Gomez-Chavez has not attempted to argue prejudice, and a review of the record shows that any such argument would be meritless. Gomez-Chavez was informed of her initial court date through a later notice of hearing, and she attended that and all subsequent hearings in her case.

---

[4] After this appeal was briefed, this Court also decided *Garcia-Romo v. Barr*, 940 F.3d 192 (6th Cir. 2019), a case that further forecloses Gomez-Chavez's claim. In *Garcia-Romo*, the panel held that even for purposes of the stop-time rule and *Pereira*, a notice to appear without the time and date of the hearing is nevertheless perfected when the government provides a later notice of hearing, with the stop-time rule taking effect on that later date. *Id.* at 196–97, 199–201. Thus, Gomez-Chavez's petition would be denied even if *Pereira* did apply to this jurisdictional question.

Thus, she cannot show that the outcome would have been any different if the original notice to appear included a date and time instead of being supplemented through the later notice of hearing, and so her due process claim must be denied.

### III. CONCLUSION

For the reasons stated above, we deny Gomez-Chavez's petition for review.